OPINION OF THE COURT
Bernard J. Fried, J.
The Manhattan Eye, Ear & Throat Hospital (MEETH or the Hospital) has petitioned for authorization to sell substantially all of its assets, pursuant to Not-For-Profit Corporation Law § 511, which requires that the court be satisfied that the “consideration and the terms of the transaction are fair and reasonable” and that the “purposes of the corporation * * * will be promoted.” (Not-For-Profit Corporation Law § 511 [d].) What is sought to be sold is MEETH’s hospital facility located at 64th Street in Manhattan to Memorial Sloan Kettering Cancer Center (MSKCC) and Downtown Group/Colony Capital (Downtown), a real estate developer. The Honorable Eliot Spitzer, in his capacity as Attorney General of the State of New York (AG), a statutorily necessary party, has opposed this petition. A 13-day evidentiary hearing was held which, with the agreement of all parties, merged the preliminary injunction application with the hearing on the merits of the section 511 petition.
Findings of Fact
A. Manhattan Eye, Ear & Throat Hospital
Established in 1869, originally located on East 34th Street, and then on East 41st Street, MEETH relocated to its present East 64th Street location in 1906, where it ultimately erected three buildings: the Old Hospital Building, the New Hospital *128 Building and the Annex. At this location, it presently operates a highly sophisticated research and teaching (until it terminated its residency program on June 30, 1999), world-renowned, acute care specialty hospital, providing outpatient and inpatient medical services in three specialized areas: ophthalmology, otolaryngology, and plastic surgery. In February 1995, MEETH opened an Outpatient Extension Center in Harlem (the Harlem Center), which, unlike the 64th Street facilities, does not provide inpatient care. Instead, it currently functions similarly to the outpatient clinic at 64th Street, and refers patients to 64th Street, for subspecialty clinics and surgery.
According to its certificate of incorporation, MEETH’s corporate purposes are: “to establish, provide, conduct, operate and maintain a hospital in the City, County and State of New York for the general treatment of persons suffering from acute short-term illnesses; performing general plastic surgery; treating persons suffering from diseases of the eye, ear, nose or throat; and maintaining a school for post graduate instruction in the treatment of such illnesses, performing such surgery, and the treatment of such diseases, and conducting associated and basic research.”
By all accounts, MEETH has outstandingly realized these corporate purposes. In order to fulfill its teaching purposes, it developed premier residency programs in the fields of ophthalmology and otolaryngology, as well as a premier fellowship program in aesthetic or plastic surgery. It has consistently been ranked among the top specialty hospitals in the United States. Its physicians have achieved world acclaim for their advancements in medical care and for their provision of acute care in these specialty areas. As to this there is no dispute.
In recent years there have been significant advances in medical technology, and an upheaval in the dynamics and economics of health care. The impact of these changes has not escaped specialty hospitals, such as MEETH. Inpatient censuses have been drastically decreasing, a trend which is expected to continue, if not accelerate, with the ongoing shifts to ambulatory surgery. Concomitant with the reduction of inpatient activity, which phenomenon itself has resulted in the reduction of hospital revenues, there have been fundamental changes in hospital economics. This, too, has impacted MEETH, which derives its revenues from several sources, including self-paying patients, reimbursements from Medicare, Medicaid and private heath care insurers, and charitable contributions. The Bal *129 anced Budget Act of 1997 (Pub L 105-33, 111 US Stat 251) has resulted in a reduction of Medicare revenues. There have also been similar reductions in reimbursements from State Medicaid and private health care insurers. This containment of medical expenses, spawned in no small part by the advent of managed care, which has decreased inpatient admission in favor of ambulatory surgery, and other cost-cutting measures, is not expected to abate.
MEETH sought to cope with this changed landscape. In 1993, the hospital obtained approval to decertify beds and to establish six additional operating rooms for ambulatory surgery. In 1995, it opened its Harlem Center as a community outreach program, which also served to funnel patients to 64th Street. Dr. George A. Sarkar, Ph D, J.D., MEETH’s Executive Director, sent to the Board members a “proposed strategic plan,” dated November 4, 1998, in which he discussed the “Sale or Lease of the Annex Building” and establishment of the proposed Brooklyn Extension Center (Brooklyn Center). Thereafter, in December 1998, MEETH applied to the State Department of Health (DOH) for authorization to open the Brooklyn Center. In its application, MEETH explained that it “is a specialty hospital located * * * at east 64th Street.” Although approved, the Brooklyn Center has not been opened.
Then in 1999 MEETH’s Board of Directors abruptly decided to sell the 64th Street facility to MSKCC and Downtown; to terminate its residency programs; to close the Hospital; to transform the Harlem Center and the planned Brooklyn Center from extension centers to free-standing Diagnostic and Treatment (D&T) Centers; and to eventually add further D&T Centers in the South Bronx. Following these decisions, MEETH entered into a nonbinding “Memorandum of Understanding” for a sponsorship agreement with New York-Presbyterian Hospital (NYPH), under which NYPH would become MEETH’s sole corporate member. Implementation of these plans necessitated the sale of the 64th Street facility, i.e., substantially all of the assets of MEETH, and led to this litigation.
B. “Friends of MEETH” Letter
On October 22, 1998, the Board of Directors received a confidential memorandum, “Re: Crisis at MEETH,” from “a group of physicians practicing at Manhattan Eye, [Ear] and Throat Hospital comprising substantially all of the members of the medical staff * * * an informal group known as the ‘Friends of MEETH.’ ” This memorandum stated that there was a “crisis at MEETH,” discussed a host of problems and *130 recommended “that the Board of Directors, in keeping with its fiduciary responsibility to the Hospital, appoint an independent hospital consulting firm to examine the operations of MEETH in their entirety.” Upon receipt of this memorandum, Mr. Lindsay C. Herkness, III, the Board President, contacted Dr. Sherrell Aston, Chairman of the Plastic Surgery Department, and requested that they meet “immediately.” Mr. Herkness stated that “[the Friends of MEETH letter] is a bad document, a dangerous document, that could be harmful to both the physicians and the hospital” and asked Dr. Aston “to use [his] influence on the medical staff to withdraw it.” When Dr. Aston refused, Mr. Herkness replied if “you guys give me a hard time and don’t do that, I’m going to sell the hospital.” Mr. Herkness did not deny that he made the remark. Rather, he testified that he did not “recall anything about selling the hospital. It was not on my mind.”
Thereafter, Mr. Herkness appointed a Special Committee, consisting of himself, Charles S. Whitman, III, Esq., and Mr. Norman Straus, to “look into the matters raised in the memorandum and to report to the full Board.” Mr. Herkness testified that there “was a great deal of concern about the allegations and the need to get to the bottom of it.” Deloitte & Touche L. L. P., the Hospital’s auditors, were retained to review the financial concerns expressed in the Friends of MEETH letter. In addition, the Special Committee directed the Hospital staff to respond, point-by-point, and the Committee had informal meetings with members of the medical staff.
On December 16, 1998, there was a Board meeting where members of the medical staff were invited to express their views. As Secretary of the Board, Mr. Whitman prepared one page of minutes from the staff notes, which merely mentioned that the physicians in attendance were allowed to state their concerns, but it did not indicate the nature of the statements. Mr. Whitman explained that “[a]s a corporate lawyer you manage to keep your Board of Directors minutes sanitized.” It was after this testimony, and as a result of a court order to produce the staff notes, that 26 single-spaced pages of notes were produced. These notes show that 20 physicians spoke out. Mr. Herkness not only described the meeting as “historic” and said that the Special Committee and the “Friends of MEETH” would meet soon, but he sent a memorandum to the members of the Board of Surgeon Directors confirming that “[o]nce the staff has made their report to the Special Committee, we can meet with the Medical Staff Leadership.” No such meeting ever oc *131 curred. There was no further Board response to the concerns expressed over the mismanagement of MEETH and the Special Committee never issued a report. Rather, in January 1999, the Special Committee metamorphosed into a Strategic Committee, with an additional Board member added, Richard W. Pendleton, Jr., Esq., and Mr. Herkness changed its mandate.
C. Decision to Monetize MEETH’s Assets and to Sell the Hospital
1. Retention of a Strategic Advisor
What occurred was that, as Mr. Whitman put it, there was “[a] bid from [MSKCC] to buy the entire hospital which came out of the blue in the middle of January of 1999.” Mr. Whitman had learned of “the approach” from Mr. Herkness, and advised Mr. Herkness that “we have to consider it [the offer] and we would need a committee to do that,” which caused Mr. Herkness to reconstitute the Special Committee into a Strategic Committee. Mr. Whitman also advised Mr. Herkness that a “financial advisor was necessary * * * because the board would need to have the offer analyzed from a financial point of view.” This led to the retention of Shattuck Hammond Partners, a Division of PricewaterhouseCoopers Securities, L. L. C. (Shat-tuck Hammond), an investment banking firm that provides services exclusively to the health care industry. According to Mr. Herkness, the offer from MSKCC was not what caused retention of Shattuck Hammond. Rather, he testified that the strategic advisors were retained after he received a draft of “Proposed 1999 Operating and Capital Budgets,” dated January 15, 1999, which he described as “horrific.” It is clear, however, that Shattuck Hammond was retained because of the MSKCC proposal.
On February 5, 1999, Mr. Herkness, with the approval of the Strategic Committee, entered into a written retention agreement with Shattuck Hammond to assist MEETH in evaluating its strategic options. The retainer agreement also authorized Shattuck Hammond to seek out parties “interested in entering into a Transaction with the Hospital,” a task which seems irreconcilable with the determination of an appropriate strategic recommendation, a determination which should have come first.[1] The “transaction” referred to was defined in the retention agreement as “any merger, consolidation, reorganization, *132 recapitalization, sale, business combination or other transaction pursuant to which the Hospital and/or any assets of the Hospital are involved in acquiring, being acquired by or combining with a third party.”
MEETH agreed to pay Shattuck Hammond a retainer fee of $100,000, and agreed that “[u]pon the closing of a Transaction,” it would pay a “Transaction Fee” of 1% of the “Aggregate Transaction Value.” According to Mr. Herkness, he had been informed that this fee arrangement was “standard in the industry.” The evidence confirms that there was an understanding that a sale was not only contemplated at the time Shattuck Hammond was retained, but was the actual expectation of the parties. Thus, Shattuck Hammond had a direct financial interest in an outcome which would require sale of the real estate. Significantly, while the fee arrangement was discussed by the members of the Strategic Committee, it does not appear to be the subject of any discussion by the Board. Indeed, neither Rozlyn Anderson, Esq., nor Mr. Underhill, both Board members, and not members of the Strategic Committee, was aware that if there was no transfer or acquisition of assets, Shattuck Hammond would not be entitled to the 1% transaction fee, although Ms. Anderson testified that had she known it would have been irrelevant.
2. MEETH is Put Up For Sale
On February 22, 1999, Mr. Herkness reported that he had appointed a Strategic Committee to assist in the review of “(1) whether MEETH can survive in today’s medical and economic environment as an independent specialty care hospital; (2) what are the strategic options available; and (3) how should MEETH respond to the possible offers from Memorial Sloan Kettering Cancer Center * * * and Mt. Sinai-NYU Medical Center Health System [Mt. Sinai].” The Mt. Sinai possibility, as noted by various Board members, “would not involve the closure of the Hospital.”
Shattuck Hammond’s written report, which Mr. Herkness had described as a “fairness opinion,” was presented. However, at trial he acknowledged that it was not a “fairness opinion,” which of course, as a financial advisor at a major brokerage firm, Mr. Herkness would have known is a term of art in the securities field.[2] Shattuck Hammond described the “Hospital’s ongoing mission * * * ‘to improve the quality of life for its *133 patients’,” and asked: “Can the Board, Management and Medical Staff counteract market forces acting against the Hospital and does the Hospital have sufficient financial resources to sustainably support all aspects of the Hospital’s current mission, role and business and charitable purposes?” Having posed this question, Mr. James S. Scibetta, a Shattuck Hammond Director, concluded that the “business had no value, but the underlying real estate has considerable value” and “that probably one of the best things for the board to consider was to look at the real estate as a very valuable asset * * * and see if it could use that as a way to capture additional resources for the board to sort of refocus its mission and do what the board had been discussing.” Mr. Scibetta thought it “ridiculous” to contend that MEETH could remain independent. And he testified that “nobody would pay one dollar in order to just take over the business as is.” It was this mindset, that the real estate was the only asset of MEETH with value, which determined the future course of events. As Mr. Scibetta put it, the Board wanted to “monetize the assets,” rather than seek to preserve MEETH as its main priority.
Neither Shattuck Hammond nor the Board considered MEETH, itself, as having any ongoing economic value. Nor was there recognition or any discussion of the value of MEETH’s name, which was considered by Mr. Morton P. Hyman, Chairman of Continuum Health Partners, Inc. (Continuum), to have “great value,” and by Mr. Terrence M. O’Brien, Executive Vice-President and Chief Operating Officer of Lenox Hill Hospital, to have “marquis value” as “one of the top hospitals in the country.” Even Mr. Herkness conceded at trial that the name had “franchise value.”
Under the heading “Outlook for MEETH as a Going Concern,” Shattuck Hammond concluded that “market forces have been and are expected to be increasingly unfavorable for the provision of services in a hospital setting,” that many of the services provided by MEETH “are being provided in doctors’ offices, free standing ambulatory surgery centers, and a number of neighboring hospitals that are competitive for such services with MEETH,” and that as a specialty hospital MEETH “has an inherently riskier business model than non-specialty hospitals with considerable financial resources and harmony *134 among physicians, management and the Board.” (Emphasis added.) The latter, of course, is a recognition by Shattuck Hammond that there was a “[l]ack of confidence and support for the current Management.” The strategic plan neither addressed this lack of “harmony,” nor discussed whether solving this lack of harmony could or would have changed or altered its evaluation and ultimate conclusions. Instead, Shattuck Hammond determined that “MEETH’s recent financial performance is not sustainable and necessitates proactive, dramatic remedial action,” pointed out that “MEETH has significant value tied up in unused or underutilized real estate assets” and purported to evaluate various strategic options, including the MSKCC “transaction opportunity,” i.e., the sale of all of the real estate, concluding that this would result in the highest “[probability of successful implementation vs. financial reward of success,” or in other words, it was the best strategic option. However, not all strategic options were evaluated. Shattuck Hammond failed to report Continuum’s expression of interest in a nonsale transaction with MEETH as a possible strategic option.
The report continued, “[i]f the [MSKCC] offer were accepted following the implementation and finalization of the plan of closure,” Public Health Law article 28 would require surrender of the hospital operating certificate; MEETH would be required to obtain certification “to conduct diagnostic and treatment activities in clinic settings”; and “[i]t is unlikely that, given the applicable statutory and regulatory framework, the corporation will be permitted to retain the name ‘Manhattan Eye, Ear and Throat Hospital.’ ” While the latter may or may not be accurate, its inclusion in the report indicates that Shattuck Hammond recognized, and communicated to the Board, its understanding that the sale of the real estate would definitively alter MEETH’s mission. Moreover, although there had been discussion at previous Board meetings about expanding the extension centers, such discussion was always in the context of the continued existence of an acute care hospital on 64th Street. The free-standing D&T Center proposal appears to be mentioned for the first time as an option identified in the Shattuck Hammond report, as it sought to “reprioritize” MEETH’s mission.
At the February 22nd meeting, Cushman & Wakefield submitted a “Restricted Appraisal Report,” concluding that value of the 64th Street real estate “was in the range of $46 to $55 million, it being understood that an approximate 12-month marketing period would be required to attempt to realize such *135 value in the real estate market.” It was pointed out that the net proceeds would be reduced by “real estate brokerage commissions in the range of 2.3%.” The fee arrangement with Shat-tuck Hammond was not discussed. The February 22nd meeting concluded with the nine Board members present (two members had been excused) unanimously voting to sell the real estate to MSKCC or Mt. Sinai, or to “any other not-for-profit health care provider for a price as near as possible to $45 million,” which was less than the Cushman & Wakefield appraisal. The Board also authorized filing of the requisite applications for regulatory and judicial approval.
Mr. Herkness testified that this decision to sell was impelled by the “doomsday scenarios” set forth in a January 15, 1999 memorandum from Mr. Leonard Weil, MEETH’s Chief Financial Officer, containing three proposed operating budgets for 1999. Mr. Herkness did not know if any of these budgets, which forecast “bottom line losses” ranging from $6,369,000 to $3,417,000, which he described as “warning shots * * * was actually adopted.” It was this memorandum that “heightened” his concerns about MEETH’s financial situation, and which led to the decision, taken within five weeks, to sell the real estate and to close MEETH as an acute care specialty hospital.[3] The Board accepted Shattuck Hammond’s negative conclusion *136 concerning “the continued viability of MEETH’s remaining an independent specialty care hospital,” and its recommendation that “the Hospital’s current mission would be de-prioritized,” a reference to elimination of the Hospital in Manhattan, terminating the performance of plastic and reconstructive surgery, and ending the “school for post-graduate education.” The minutes do not record any discussion as to what MEETH planned to do with the net proceeds, although Mr. Herkness and Dr. Sarkar each testified that the sale proceeds were intended to be applied to transform MEETH from its historical role as a teaching specialty hospital into free-standing D&T Centers in underserved areas of New York City.
3. Expressions of Interest in Keeping MEETH (Prior to February 22, 1999)
Prior to the February 22nd decision to sell, there had been expressions of interest in keeping MEETH as an acute care specialty hospital which were neither mentioned at the Board meeting, nor in the Shattuck Hammond report. One such expression came from the New York Eye & Ear Infirmary (NYEEI), which in February was well into joining Continuum. Discussions with NYEEI had, in fact, been ongoing for years. Continuum had also shown interest in MEETH: the previous year, in March 1998, Dr. Robert G. Newman, Continuum’s President and CEO, met with Dr. Sarkar. Nothing came of that meeting. Thereafter, on December 18, 1998, Mr. Hyman met with Mr. Herkness, and other MEETH officials, in connection with MEETH’s desire to sell the Annex. At this meeting, Mr. Hyman referred to Continuum’s discussions with NYEEI and suggested that they explore “possibly merging the two institutions [MEETH and NYEEI].” Mr. Herkness replied that *137 MEETH “was very strong financially, certainly stronger than New York Eye and Ear and that he [c]ouldn’t see any reason really to combine unless basically New York Eye and Ear gave Manhattan Eye and Ear the keys, but he would consider that and possibly get back to me [Mr. Hyman].” Mr. Herkness testified that Mr. Hyman “was rather enthusiastic” about MEETH fitting into the NYEEI affiliation, although Mr. Herkness testified that he had no interest, because “at that point we still thought we had a viable enterprise.” Thus, contrary to Mr. Scibetta’s view that “nobody would pay one dollar in order to just take over the business as is,” there was interest from other medical institutions in seeking to preserve MEETH as a world-class teaching and research hospital, which were ignored by the Board in adopting the recommendations of Shattuck Hammond, its strategic advisor.
4. March 22, 1999 Board Meeting: Mt, Sinai Offer Discussed
On March 11, 1999, Mt. Sinai and MEETH entered into a 30-day, binding agreement, which contained a no-shop clause,[4] to sell the real estate for $46,000,000. Under this agreement, Mt. Sinai would continue to maintain MEETH’s mission as an acute care specialty teaching hospital. This proposal was discussed at the March 22, 1999 meeting of the Executive Committee of the Board of Directors. It was explained by the Strategic Committee that “such a transaction would bring a large critical mass and expertise to MEETH’s existing operation, keep the Hospital’s present services as well as add to them, ensure the continuance of the Residency Programs, and maintain all Hospital employees in their present or similar positions. This would allow MEETH to continue to run extension centers in underserved areas and fund research.” This agreement between MEETH and Mt. Sinai lapsed before the next Board meeting.
5. Board’s Decision to Open the Bidding Up
At its April 15, 1999 meeting, the Board was told by Mr. Scibetta that both MSKCC and Mt. Sinai had “backed away from their initial proposals and have indicated an interest only at a price substantially below the $46 million minimum amount * * * in the appraisal.” Mr. Scibetta recommended that MEETH should “open up the process and inject some competitive forces into the negotiations.” Because the Board “wanted to be able to offer [the properties] to real estate developers as *138 well as to make sure that all of the potential bidders on the upper east side real estate [sic] would be approached,” it voted to retain Cushman & Wakefield as its broker. Shattuck Hammond was to contact “likely not-for-profit hospital entities” and Cushman & Wakefield would seek to qualify “five or six of the most prominent and likely real estate buyers.”
Previously, however, in late February or early March, Mr. Hyman, from Continuum, had spoken with Mr. MacRae, MEETH’s attorney, who, as required by the no-shop clause, said “that the negotiations between MEETH and another hospital were so far along that they did not feel they could discuss any other corporate possibilities with [Continuum] or anyone else, and that they felt ethically and morally bound not to enter into such discussions.” The Board was not informed of this conversation. From the evidence it is clear that by the time the Mt. Sinai offer had lapsed and Cushman & Wakefield had been retained, the Board’s goal, as Mr. Scibetta testified, was “to obtain fair value for the assets, and for the bids to be in by basically, I think we had established early May.” No reason has been provided for this haste to sell the real estate, a haste which seems particularly unnecessary in light of the Cushman & Wakefield Restricted Appraisal Report, which had stated that the required marketing period would be approximately one year. Nor was there any reason as to why Continuum’s interest in preserving MEETH by entering into a nonsale transaction was not included in Shattuck Hammond’s report as a possible strategic option.
On April 25, 1999, the New York Times reported that MEETH was for sale.
Thereafter, a scheduled annual Board meeting was held on April 29, 1999, at which time Mr. Scibetta said bids were expected to be received, beginning on April 30th, and he reiterated that Shattuck Hammond had determined “that the Hospital’s business had no value.” He also advised the Board that “[ajlthough Shattuck Hammond Partners tried to interest Mt. Sinai in taking over MEETH, Mt. Sinai was disinterested in keeping the business and only interested in the real estate aspect of the transaction, at a figure much lower than the appraisal.” At this meeting, the Board voted to sell the Hospital, at a price in excess of $40,000,000. There was no explanation for this decision to sell the real estate for less than its appraised value of $46 to $55 million. At this meeting, authorization to seek regulatory approvals was again provided. Moreover, the Board now realized that its sale and closure plan, *139 leading to free-standing D&T Centers, would require an amendment to the Hospital’s certificate of incorporation, and a proposed amendment was authorized, although never submitted.
Now, two months after the Board initially had voted to sell its real estate, the minutes for the first time identify, in the context of discussion of the New York Times article, that the Board had decided that “the Hospital was going back to its original mission of serving the poor in underserved areas, and redirecting its charitable assets to accomplish this goal.” Other than the Shattuck Hammond report, which discusses the Hospital’s “original” mission, there is no written record concerning this momentous decision. There had been no study concerning this so-called return to the “original mission” and no proposal or recommendation on the subject was provided to the Board for its review and deliberation. Notably, there was no management plan or recommendation discussing the need to return to this “original” mission, nor do prior Board minutes report any discussion held on the subject.
6. Board Accepts Downtown and MSKCC Offer
By the May 5, 1999 Board meeting, four separate proposals had been received, including a $41,000,000 bid from Downtown and MSKCC (and two proposals from real estate developers). According to this offer, MSKCC would open a breast cancer facility in the New Hospital Building, and the remaining real estate, to be purchased by Downtown, would be used as a building site for an apartment building. Mt. Sinai submitted two alternative proposals: (1) a $27,500,000 offer for the real estate, with the Hospital closed, and (2) an offer to acquire the Hospital and its operations for “a very substantially reduced price.” Because the second Mt. Sinai offer was “vague,” the Board took a “short break” in its meeting during which Mr. Scibetta, at the Board’s request, placed a telephone call to Mr. Barry Friedman, Mt. Sinai’s President and Chief Financial Officer, who stated that Mt. Sinai would seek a “very reduced price,” in the range of $5 to $11 million, and would only commit to running MEETH for up to two or three years. This spur-of-the-moment telephone conversation persuaded the five Board members who were present that the MSKCC offer should be accepted “promptly.” Somehow, this telephone call to Mr. Friedman had confirmed Shattuck Hammond’s view that MEETH had no value, beyond the real estate it was “sitting” on, warranting acceptance of the MSKCC offer.
The Board took no further steps to seek a bidder which would save MEETH’s long-established mission. Instead, it decided *140 that “the most preferable offer” would be a combination of “fair and reasonable consideration” together with the involvement of a major tax-exempt hospital. This sale would “provide the necessary funding for the Board’s envisioned diagnostic and treatment centers and other hospital-type activities to be relocated to medically underserved areas in New York City.” The Board then approved a sale to Downtown and MSKCC. That same day, Mr. Herkness executed a nonbinding letter of intent, without a no-shop clause, to sell the real estate to Downtown and MSKCC. (On June 25, 1999, the parties entered into a “Real Property Contract for Sale” [Contract].)
The May 5th minutes record that after the decision to sell was approved, “[t]he Board then discussed the issue of closing the Hospital. The Board noted that no actual decision had been made to close the Hospital.” (Emphasis added.) Previously, on April 29, 1999, the Board had terminated the residency program and authorized the President to prepare for possible Hospital closure. However, even as of May 5th, as the minutes show, the Board did not seem to believe that it was actually closing the Hospital. One has to wonder exactly what the Board thought it was doing. Then, without a record of further discussion or Board authorization following this May 5th meeting, MEETH submitted a closure plan to the DOH on June 14, 1999, as an attachment to a letter from Dr. Sarkar, in which he also “requested issuance of a diagnostic and treatment center operating certificate for the existing Harlem facility.” It was after this that Mr. Herkness sought (and obtained) “a resolution reaffirming the Hospital’s intent to close the East 64th Street facility.” This occurred at the July 26, 1999 Board meeting.
As of July 26th, the Board had neither received nor commissioned any study with regard to the Board’s planned use of the sales proceeds to establish D&T Centers, the necessity for such centers, or the viability of such centers. It was an idea in progress. It may be that written documentation, at this point, was not needed, if there had been any other type of evaluation; however, there was none. There had been no consultation with the medical staff or other medical experts or health care experts or anyone else concerning its feasibility or viability. Rather, Mr. Herkness testified that the “best feasibility study is five years of experience.” It bears noting, however, that MEETH had no experience with free-standing D&T Centers. At best, this plan evolved from the Harlem Center, which was an extension center, and not a free-standing center. Nonetheless, without such seemingly basic information, the decision to sell and close was made. *141 From these events, the conclusion is inescapable, based upon all the credible evidence, that the Board, recognizing MEETH’s financial problems, certainly after the March 11,1999 Mt. Sinai letter of intent lapsed, chose not to seek a solution that would preserve the Hospital, either itself, or in some sort of affiliation with a major medical institution that would be willing to try and preserve MEETH’s historic purposes. Rather, the Board decided on a course of action which would lead to the sale and closure of the Hospital, and then provide the Board with a substantial sum of money to allow it to take MEETH down the path to new, unstudied and unevaluated charitable purposes.
MEETH began to act, i.e., it terminated the residency program, upon the assumption that it would receive DOH approvals for closure and establishment of the D&T Centers. It executed a letter evidencing its intent to sell to MSKCC, and chose to take steps to effectuate closure and receive regulatory approval for its plan, to enter into a contract for sale, and then to seek court approval under section 511. This would have had the effect of presenting the court with what would have been essentially a fait accompli. To put it another way, if everything went as hoped for, MEETH would have been able to present the section 511 petition pertaining to an already closed hospital, with DOH approval for the D&T Centers, and it would have asked the court to find “that the purposes of the corporation * * * will be promoted.” This would have effectively neutralized, or substantially compromised, any meaningful judicial role in the section 511 process. Indeed, under the scenario envisaged by MEETH, denial of the petition would have been a pyrrhic victory for its opponents: the Hospital would already be closed; under such circumstances, a court order could hardly have restored MEETH.
D. Events Following the Decision to Sell and Close MEETH
1. MEETH Doctors Seek to Enjoin the Proposed Sale
On May 10, 1999, a CPLR article 78 petition was filed to enjoin the proposed sale to Downtown and MSKCC. The Attorney General did not participate in this proceeding. Rather, in a letter from William Josephson, Esq., Assistant Attorney General, Charities Bureau, the court was advised that “[s]ince the proposed transaction is in a preliminary stage, it would be premature for us to take a formal position on it.” On May 28, 1999, the petition was dismissed. What the article 78 proceeding demonstrated, however, is that the medical staff played no role in the decision to sell and close the Hospital: it was not *142 consulted and the Board did not respond to written entreaties on behalf of the doctors. While they were not necessary parties, in a legal sense, Mr. Herkness and the Board recognized that it was the medical staff that distinguished MEETH. Nevertheless, the Board members believed that the doctors were acting in their own self-interest in opposing the sale and did not involve them in its fundamental decisions affecting the future of MEETH.
2. MEETH Commissions Business Plan Re: D&T Centers
Following the June 14, 1999 submission of the closure plan to DOH, Mr. Wayne M. Osten, Director, Office of Health Systems Management, DOH, wrote to Dr. Sarkar on July 22, 1999, and requested “a business plan or financial feasibility analysis on the proposed MEETH Diagnostic and Treatment Centers.” This request caused MEETH, which had made the decision to transform MEETH’s mission without detailed analyses, and had no studies, reports or other documents concerning the D&T plan, to retain outside consultants, Dr. Frank Cicero of Cicero Shapiro Velazquez & Cicero, and Mr. Charles Kachmarick, President, Sterling Health Capital Management. These consultants were retained “to develop a business plan in support of the proposed MEETH Diagnostic and Treatment Center.” Significantly, they were charged with supporting the already decided-upon plan. The Cicero/Sterling study, entitled “Manhattan Eye, Ear & Throat Hospital Business Plan For Fulfillment of Mission Statement” (Business Plan), not unsurprisingly supported closure of the Hospital, and the transformation of MEETH from a world-class teaching hospital to operating two D&T “sites in under-served areas in Harlem and Brooklyn.” The Board had decided upon the mission statement, and the retained consultants then wrote the “Operational Plan,” and provided a “Need Assessment” and “Financial Projections.” Neither Dr. Cicero nor Mr. Kachmarick looked at or evaluated, or were asked to look at or evaluate, any of the proposed alternatives to closing MEETH. Indeed, Dr. Cicero, who testified that he was aware of Continuum’s interest, and “possibly Mt. Sinai,” stated that it would have been “inappropriate” for him to talk with interested potential bidders for MEETH.
At its September 21, 1999 meeting, the Business Plan was accepted by the Board. It was also at this meeting that the Board authorized the filing of a petition seeking court approval of the sale of the Hospital’s real estate. Under the terms of the June 25, 1999 contract, this petition should have been filed *143 within 60 days. While there has been no explanation for the failure to file in accordance with the contract, there is no doubt that MEETH was putting off instituting the judicial petition while awaiting the hoped-for DOH approvals for the closure and D&T plans. By September 21st, it decided it could not put off the filing any longer.
3. Attorney General Becomes Involved
Since as a type B, i.e., charitable, corporation, MEETH does not have shareholders, the Attorney General, acting as parens patriae, is statutorily involved whenever such a charity seeks to dispose of all, or substantially all, of its assets, as MEETH resolved to do (N-PCL 511). Upon learning from the New York Times article of the decision to sell, Paula Gellman, Esq., Assistant Attorney General, Division of Public Advocacy, wrote to Dr. Sarkar on April 27, 1999, and explained that it was “common practice” for the AG to become involved “before a formal submission is made to the Supreme Court so that we may review the papers and raise any questions or concerns we have in advance.” This led to a meeting at the AG’s office, which was followed by a June 3rd letter from Mr. Josephson to Thomas Ruggiero, Esq., one of MEETH’s counsel, stating that since it decided to sell the Hospital, the Board is required “to entertain all responsible proposals, not to favor any bidder over another in the process, and to treat all bidders and potential bidders identically and fairly.” This letter was submitted because the AG had received complaints alleging that other interested buyers were not able to obtain pertinent information. In response, the AG was advised that “a successful bidder has been selected and pursuant to a letter of intent, good faith negotiations regarding the definitive contract are continuing.” The AG was not told that the letter of intent was not binding, and that it did not contain a no-shop clause. Nor were other interested parties advised that it was nonbinding. Mr. Scibetta testified that MEETH could not “be seen actively soliciting proposals, but we are more than willing to review any proposals, and the board would have a fiduciary responsibility to do so.” This statement was incorrect; there was nothing in the nonbinding letter which would have prohibited MEETH from actually seeking to preserve its mission.
On June 23, 1999, Dietrich L. Snell, Esq., Deputy Attorney General, Division of Public Advocacy, wrote to MEETH’s counsel, complaining that there were other “bona fide offerors” and that “[w]e are not aware of * * * one single shred of evidence that MEETH is actively exploring in good faith all or *144 even any of these expressions of interest [which would preserve MEETH].” This statement proved to be accurate.
Thereafter, the AG’s representatives were ultimately invited to attend the July 26, 1999 Board meeting, both the full meeting attended by several doctors from the medical staff, and the Executive Session. At both of these meetings, Mr. Scibetta evaluated various offers, and reiterated that it was the opinion of Shattuck Hammond that the Hospital’s “business had negative value.” At the end of the Executive Session, Mr. Herkness said that “[i]t was the sense of the Board of Directors to monetize the real estate.” The decision to go forward with the sale to MSKCC and Downtown was unchanged.
Representatives of the AG continued to meet with MEETH, DOH officials, and others, over the additional concern that MEETH was engaging in a de facto closure of the Hospital, since its closure plan had not received DOH approval. The AG also continued to insist that MEETH must negotiate in good faith with other potential bidders. When MEETH filed this petition, the AG opposed it on the ground that other offers had been submitted, which would have preserved MEETH, and that there had been no genuine effort to negotiate with these bidders in good faith.
E. Alternative Proposals Designed to Preserve MEETH
1. Continuum Proposal
Mr. Hyman, Chairman of Continuum, having been told in late February or early March that MEETH was in negotiations which were “far along” with an unnamed hospital, and that it could not discuss other proposals, did nothing further until he read the New York Times article. He then met with MEETH’s physicians and he agreed to try to accommodate at Continuum the medical staff, who would be dislocated upon the sale of the Hospital, and the residents, whose program was being discontinued on June 30, 1999. This led to Mr. Hyman writing a letter on June 29, 1999 to Mr. Herkness in which he proposed a solution which would allow MEETH to continue its mission. Mr. Hyman testified that Continuum proposed “to take the facility over. We were confident that with different management * ** * as well as our financial strength * * * we could continue MEETH in furtherance of its mission.” Continuum’s offer was that MEETH “join” its health care network and combine with NYEEI, which had just joined Continuum. It was not an offer to purchase the assets. Continuum would have maintained the Harlem Center; however, no commitments were made with regard to the proposed D&T Centers since the specific proposal *145 was not shown to Continuum. Mr. Hyman explained that they would have to perform “due diligence” to determine if the proposal was “sound.” Continuum was prepared to “guarantee” MEETH against all losses for five years and to invest “$10 million, as needed” (a figure which was later raised to $15 million). Finally, since the proposal was for MEETH to merge with NYEEI, this proposal additionally provided MEETH with the security of the assets of NYEEI, and its unencumbered real estate. Recognizing that “in the future, it might be appropriate for MEETH to sell a portion of its real estate!,]” Continuum guaranteed that “[e]very dollar raised from the sale of any asset of MEETH must stay with MEETH and be used solely for the advancement and enhancement of MEETH.”
A condition of Continuum’s proposal was that “the existing members of the Board of Directors of MEETH are to resign upon the consummation of this transaction.” As Mr. Hyman put it, Continuum’s proposal left no money for the use of MEETH’s Board in its plan to establish the two D&T Centers, or to expand into other geographical areas. He pointedly testified that the Board did not “have an interest separate and apart from the institution itself,” and questioned “why a board insists upon receiving money to go off and do their own thing.” He explained that if “the standard of comparing a hospital’s value as an ongoing concern [is] by looking at the operating income and the operating expenses versus the asset value, then * * * almost every hospital in Manhattan would have to sell its real estate and go out of business.” To preserve MEETH, Continuum was prepared to keep, as minority members, those current Board members who are prepared “to support” the “one hundred and thirty year old” mission of MEETH.
On July 1, 1999, Mr. Hyman proposed an “immediate” merger between MEETH and NYEEI, and agreed to “guarantee all obligations now existing at MEETH.” He received no response from Mr. Herkness to either of his letters. However, on July 10, 1999 Mr. Hyman received a letter from Mr. Scibetta, asking him to meet with him. On July 13th, they spoke on the telephone, and Mr. Scibetta wanted to know “what Continuum was prepared to bid for the MEETH real estate.” Told that Continuum did not want to buy the real estate, but rather to “continue MEETH exactly where it was,” Mr. Scibetta replied “that’s very nice, but our board has decided that we are going to sell the real estate.” When asked the “purpose” of having a meeting, since Continuum was not a bidder for the real estate, Mr. Scibetta replied that “you know what this is all about and *146 I think we should get together.” A meeting was scheduled for July 15th but was never held.
What occurred is that after the telephone conversation, Mr. Hyman invited representatives of the AG to the meeting, “because so many misunderstandings seem to have cropped up already, that I didn’t want to come out of a meeting and have more misunderstandings.” The morning of the meeting, Mr. Scibetta learned that Mr. Hyman had invited representatives of the AG, and told Mr. Hyman that he would not attend the meeting. When asked why, Mr. Scibetta replied that “what he had to tell me he would not [say] in front of the Attorney General.” Mr. Scibetta confirmed that he had refused to attend the meeting with representatives of the AG. He testified, as he had informed the Board, that it was inappropriate for these representatives of the AG to attend the meeting with Continuum, in light of the fact that other potential bidders had not made similar requests.
At the July 26, 1999 Board’s Executive Session, Mr. Scibetta reported that on July 1st Continuum had submitted a proposal. He explained that MEETH would become a “subsidiary,” the Board would be required to resign, and then he incorrectly characterized the proposal merely as an offer to “invest up to $10 million * * * [which] was inferior in all respects to the Mt. Sinai proposal of May 5, which had already been rejected by the Board of Directors.” Neither orally nor in the written report was the Board advised of the full scope and nature of Continuum’s proposal, including that it would guarantee all of MEETH’s losses for five years.
Thereafter, in mid-September, Mr. Hyman received an invitation to meet with Mr. Scibetta, and on September 17, 1999, he attended a meeting with Mr. Scibetta, Mr. Herkness, and two other Board members, Mr. Chips Chapman Page, and Mr. Richard W. Pendleton, Jr. Continuum’s proposal, which included that it was prepared to take over and run MEETH within 24 hours, was described. Continuum was also prepared to invest beyond the $15 million, “if we had an opportunity to discuss the proposal with the MEETH board.” Mr. Hyman further explained that if MEETH’s real estate were to be sold in the future, the proceeds would remain “within the MEETH facility to support its mission.” Mr. Herkness and Mr. Scibetta told Mr. Hyman that “the board has decided that we want to sell the real estate. [And asked:] Are you prepared to make a bid,” to which Mr. Hyman replied “absolutely not.” During the meeting, either Mr. Herkness or Mr. Scibetta inquired whether *147 Continuum was willing to indemnify MEETH against MSKCC, if liability arose from “break[ing]” the Contract. Believing, correctly, as it turned out, that the Contract was conditioned upon regulatory and judicial approvals, Mr. Hyman asked to see the written Contract, in order “to know what it was that we were being asked to indemnify.” This request was refused and the meeting ended. There were no further discussions with Continuum.
2. Lenox Hill Proposal
Mr. O’Brien, Executive Vice-President and Chief Operating Officer, and Ms. Gladys George, President and Chief Executive Officer of Lenox Hill, on June 23, 1999, met with Mr. Scibetta, who told them that MEETH was about to sign an agreement to sell its property and inquired whether Lenox Hill “would like to buy their property.” Mr. O’Brien replied it was not interested in purchasing “the property, [but] we would be very much interested in having a potential relationship with MEETH, either a merger or a sponsorship, where we could keep MEETH open and could continue to fulfill its mission.” This led to a June 25th letter from Ms. George to Mr. Herkness, expressing her desire to meet with him and MEETH’s Board “to discuss this matter further.”
On July 1, 1999, Lenox Hill sent Mr. Herkness a written proposal to sponsor MEETH, which would become a subsidiary of Lenox Hill, with Lenox Hill as the sole voting member. Under the terms of this proposal, which Ms. George wrote would “result in an approximately $50 million financial benefit,” MEETH would continue in the New Hospital Building on East 64th Street, and Lenox Hill would guarantee “to invest not less than $3 million per year for not less than ten years to support the hospital and related services provided by MEETH.” Title to the Old Hospital Building and Annex, which had been appraised as worth from $16.6 to $20.2 million, would be transferred to a newly created MEETH Foundation, whose trustees would be MEETH’s existing Board. This Foundation could use the proceeds to further MEETH’s corporate purposes, including patient care at the New Hospital. Lenox Hill was prepared to operate MEETH immediately. Ms. George was “anxious” to meet with MEETH to “refine the terms and conditions” of this proposal. On July 14, 1999, Lenox Hill officials again met with only Mr. Scibetta, even though they had “requested on a number of occasions” to meet with MEETH’s Board members. Mr. Scibetta made it clear that MEETH was “very focused on trying to complete the [MSKCC] transaction.” *148 This led to Lenox Hill formulating another proposal, which was contained in a July 15th letter sent to Mr. Herkness, the so-called Lenox Hill No. 2 proposal which continued the sponsorship proposal, but recognized the MSKCC and Downtown Contract.
The Lenox Hill proposals were discussed at the July 26, 1999 Board meeting, at which representatives of the AG and the DOH were present by invitation. Also invited were Mr. Michael P. Gutnick, Senior Vice-President, Cushman & Wakefield, and James Lytle, Esq., attorney for MSKCC. Several members of the medical staff were also present. No invitation had been extended to Lenox Hill. Shattuck Hammond presented a written report in which, inter alia, it described the Lenox Hill proposals, and mischaracterized the proposals concerning the purpose of the MEETH Foundation. Moreover, Mr. Scibetta failed to inform the Board that Lenox Hill, as stated at the July 14th meeting, would be willing to establish “a separate LH-MEETH subsidiary” if that would be more desirable to the Board. On July 30, 1999, Ms. George wrote to Mr. Scibetta, complaining of these mistakes, and sent copies to the Board members. She also requested a meeting with Mr. Scibetta and the Board. There was no response. Thereafter, a meeting was held on September 16, 1999; representing Lenox Hill were Mr. James Marcus, Chairman of the Board, Ms. George, Mr. O’Brien, and representing MEETH were Mr. Scibetta, Dr. Sarkar, Mr. Herkness, Mr. Whitman (who had to leave early), and another Board member. At this meeting, Lenox Hill explained its proposals. Mr. Herkness then requested that MEETH be provided with additional documentation “outlining exactly what the MEETH Division would be.” Ms. George responded that it would take “a week or so to put together the [requested] detailed information.” Mr. Herkness replied “fine,” they all shook hands, and the meeting ended. Lenox Hill started to assemble material requested by Mr. Herkness. However, it never completed the assembly and forwarding of the materials because on the following Tuesday, September 21, 1999, the Board authorized its counsel “to proceed as expeditiously as practicable to file the Section 511 petition” seeking judicial approval of the sale to MSKCC and Downtown. This petition was filed later that day. The Board was not informed of the meeting held with Lenox Hill, nor was it informed that Mr. Herkness had requested additional information and that he had been told by Ms. George it would be submitted in “a week or so.”
*149 F. MEETH’S Plan
MEETH’s plan is to sell a part of its real estate to MSKCC, one of the world’s outstanding cancer treatment and research centers. MSKCC plans to convert the New Hospital Building to expand its breast cancer center. Undeniably, this would be an extremely worthwhile use. However, the issue under section 511 is not the buyer’s planned use of the real estate, however worthy that use may be, but whether seller’s use of the sale proceeds will promote its own corporate purposes. (E.g., Matter of St. Luke’s Hosp., 33 Misc 2d 888 [Sup Ct, NY County 1962].) The remaining real estate will be sold to Downtown, a real estate developer, which intends to erect an apartment building on the site.
Upon completion of the transaction, and following the hoped-for DOH approval, MEETH will close its existing specialty hospital. If further DOH approvals are obtained, MEETH will then convert the existing Harlem Center and the already approved though-not-yet built Brooklyn Center to the proposed D&T Centers. In addition, as part of the transaction MEETH also has proposed entering into a sponsorship agreement with New York-Presbyterian Hospital.
Although there is no mention of it in the minutes of the April 29th Board meeting, at which the sale of the real property and termination of the residency programs were authorized, the day before, on April 28th, Mr. Herkness had met with Dr. David B. Skinner, Vice-Chairman and Chief Executive Officer of NYPH, and proposed placing MEETH’s soon-to-be displaced residents at NYPH. Also discussed was “developing a continuing working relationship with” NYPH. After a series of meetings between MEETH and NYPH officials, on July 26, 1999, the Board authorized an “affiliation agreement * * * with [NYPH] relating to the Hospital’s Harlem Center and its proposed Brooklyn Center.” The Board authorized the NYPH arrangement, and thereafter NYPH and MEETH entered into a “non-binding” memorandum of understanding, dated September 30, 1999. Under this agreement, as Mr. Louis F. Reuter IV, Vice-President of Administration for NYPH, testified, $10 million of the proceeds from the sale of the real estate would be placed into a restricted fund for MEETH’s programs which would be housed at NYPH; the remaining $31 million would be available for MEETH’s use, including the D&T Centers proposal. This NYPH sponsorship does not necessarily envisage a separate MEETH hospital facility; rather, “the ophthalmology and otolaryngology clinics at NYPH will have appropriate *150 plaques and/or signage which will acknowledge the MEETH Division.”
Conclusions of Law
At issue is whether, as required under section 511 (d) of the Not-For-Profit Corporation Law,[5] MEETH has shown “to the satisfaction of the court,” both that the “consideration and the terms of the transaction are fair and reasonable”[6] and that “the purposes of the corporation * * * will be promoted”[7] by the sale of all or substantially all of the hospital’s assets to Downtown and MSKCC. The few reported decisions dealing with this section have held that whether “the consideration and the terms of the transaction are fair and reasonable to the corporation” is to be evaluated at the time that the contract to sell is entered into. (Church of God v Fourth Church of Christ, Scientist, 76 AD2d 712, 717-718 [2d Dept 1980], affd 54 NY2d 742; Wolkoff v Church of St. Rita, 132 Misc 2d 464, 471 [Sup Ct, Richmond County 1986]; Matter of Church of St. Francis de Sales, 110 Misc 2d 511, 512 [Sup Ct, NY County 1981].) On the other hand, the cases hold that whether “the purposes of the corporation * * * will be promoted” is to be evaluated “ ‘in light of conditions prevailing at the time the issue is presented to the court’.” (Manhattan Theatre Club v Bohemian Benevolent & Literary Assn., 120 Misc 2d 1094, 1097 [Sup Ct, NY County 1983], quoting Church of God v Fourth Church of Christ, Scientist, 76 AD2d 712, 717.) Given my findings of fact, I conclude that MEETH has not satisfied either prong of section 511. Therefore I deny MEETH’s petition to approve the proposed sale.
*151 Before turning to section 511, there are several areas that warrant brief discussion. Not-for-profit corporations operate under legal regimes designed for traditional for-profit corporations.[8] However, fundamental structural differences between not-for-profit corporations and for-profit corporations render this approach incapable of providing effective internal mechanisms to guard against directors’ improvident use of charitable assets. For example, in the for-profit context, shareholder power ensures that boards make provident decisions, while in the not-for-profit context, this internal check does not exist. To put it another way, a nonprofit corporation has no “owners” or private parties with a pecuniary stake to monitor and scrutinize actions by the directors. This distinction is even more significant in the case of charitable corporations, such as MEETH, where there are no members, because the Board is essentially self-perpetuating. (Explanatory Mem No. 1, Jan. 13, 1969, McKinney’s Cons Laws of NY, Book 37, Not-For-Profit Corporation Law, at XX [1970 ed].)
The Not-For-Profit Corporation Law addresses this lack of accountability by requiring court approval of fundamental changes in the life of a type B charitable corporation, such as a disposition of all or substantially all assets, since there are no shareholders whose approval can be sought. The Attorney General is made a statutory party to such petitions, and his “active participation” is presumed. (See, Bjorklund, op. cit., § 8-2 [a], at 238.) This is to ensure that the interests of the ultimate beneficiaries of the corporation, the public, are adequately represented and protected from improvident transactions. (Rose Ocko Found, v Lebovits, 259 AD2d 685, 688 [2d Dept 1999], citing Church of God v Fourth Church of Christ, Scientist, 76 AD2d, supra, at 716; Wolkoff v Church of St. Rita, 132 Misc 2d 464, 467, supra.) It is pursuant to this mandate that this court is called upon to review the sale of substantially all of MEETH’s assets to MSKCC and Downtown.
A charitable board is essentially a caretaker of the not-for-profit corporation and its assets. As caretaker, the board “ha[s] the fiduciary obligation to act on behalf of the corporation * * * and advance its interests” (Pebble Cove Homeowners’ Assn. v Shoratlantic Dev. Co., 191 AD2d 544, 545 [2d Dept], lv dismissed 82 NY2d 802 [1993]) in “good faith and with that degree *152 of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions.” (N-PCL 717 [a].) This formulation of the board’s duty of care is an “expansion” of the comparable section of the Business Corporation Law which does not contain the words “care” and “skill” (Wyckoff, Practice Commentaries, McKinney’s Cons Laws of NY, Book 37, N-PCL 717, at 350-352), and firmly establishes the appropriate standard of care for directors of a not-for-profit corporation.
It is axiomatic that the board of directors is charged with the duty to ensure that the mission of the charitable corporation is carried out. This duty has been referred to as the “duty of obedience.” It requires the director of a not-for-profit corporation to “be faithful to the purposes and goals of the organization,” since “[u]nlike business corporations, whose ultimate objective is to make money, nonprofit corporations are defined by their specific objectives: perpetuation of particular- activities are central to the raison d’etre of the organization.” (Bjorklund, op. cit., § 11-4 [a], at 414.) Analysis of the duties of charitable directors more commonly arises in an action brought by the AG alleging breach of the duties owed to the corporation under N-PCL 112 and 720, and does not appear to have been discussed in any reported decision under section 511. But the duty of obedience, perforce, must inform the question of whether a proposed transaction to sell all or substantially all of a charity’s assets promotes the purposes of the charitable corporation when analyzed under section 511.
In recent years, across the United States, there have been a series of transactions that, although certainly different from this petition, nevertheless resemble, in certain basics, MEETH’s proposal. I am referring to the nationwide spate of conversions of nonprofit hospitals into for-profit hospitals which has caused a substantial output of commentary. (E.g., Stampone, Turning Patients Into Profit: Nonprofit Hospital Conversions Spur Legislation, 22 Seton Hall Legis J 627 [1998]; Hyman, Hospital Conversions: Fact, Fantasy, and Regulatory Follies, 23 J Corp L 741 [1998]; Brody, The Limits of Charity Fiduciary Law, 57 Md L Rev 1400, 1458-1476 [1998]; Hernandez, Note, Conversions of Nonprofit Hospitals To For-Profit Status: The Tennessee Experience, 28 U Mem L Rev 1077 [1998]; Krause, “First, Do No Harm”: An Analysis of the Nonprofit Hospital Sale Acts, 45 UCLA L Rev 503 [1997]; Rubin, Nonprofit Hospital Conversions in Kansas: The Kansas Attorney General Should Regulate All Nonprofit Hospital Sales, 47 U *153 Kan L Rev 521 [1999]; see also, Gassel and Gerzog, Conversions of Not-for-Profit Organizations Proliferate, NYLJ, Aug. 29, 1996, at 7, col 1.) It has also resulted in some 20 States enacting or considering legislation regulating such conversions (see, Hernandez, op. cit., at 1102, n 125 [collecting statutes and pending legislation]). However, there has been no similar activity and little discussion in New York where such conversions are not permitted.
Nonetheless, the conversion analogy is analytically useful. This is because, absent the for-profit component, which of course is absent in a section 511 petition, a conversion is conceptually similar to MEETH’s petition, inasmuch as in both there is a charitable organization which alleges that it is incapable of continuing its primary mission of operating a hospital, seeks approval of the sale of all its assets, and plans to apply the sale proceeds towards a newly revised mission. As is relevant to the analysis, for example, legislation in one State requires that the Attorney General examine the transaction to determine:
“(2) Whether the nonprofit hospital exercised due diligence in deciding to sell, selecting the purchaser, and negotiating the terms and conditions of the sale;
“(3) Whether the procedures used by the seller in making its decision, including whether appropriate expert assistance was used [were fair];
“(4) Whether conflict of interest was disclosed, including, but not limited to, conflicts of interest [of] board members * * * and experts retained by the seller [;] [and]
“(5) Whether the seller will receive reasonably fair value for its assets.” (Krause, op. cit, at 551 [summarizing criteria specified in the Nebraska statute].)
I believe this to be a clear and concise statement of factors which a court should be concerned with in evaluating a transaction under section 511 to sell all the assets. Indeed, they are in many respects mirrored in the AG’s June 3, 1999 letter to MEETH, in essence agreed to by MEETH’s counsel, in which the AG wrote “Elementary principles of corporate and fiduciary law require the Board, after it has decided to sell the hospital, to entertain all responsible proposals, not to favor any bidder over another in the process, and to treat all bidders and potential bidders identically and fairly.”
I turn now to the first prong of section 511, which requires that “the consideration and terms of the transaction are fair *154 and reasonable to the corporation.” Because the sale of the real estate, as proposed, is inextricably interwoven with the closure of MEETH as it exists today, I believe that the transaction as a whole must be examined, not just the “fair market value” of the real estate. This transaction is unlike, for example, Matter of Church of St. Francis de Sales (110 Misc 2d 511, supra), a simple transaction which dealt only with the question of the value of a building being sold by the Church; there was no larger transaction involved. There do not appear to be reported decisions of more complex transactions, such as here, where implementing its decision to sell its real estate assets to MSKCC and Downtown would require the closing of MEETH and a fundamental change to its corporate purposes. The Board accepted Shattuck Hammond’s conclusion that “the business [of MEETH] had no value,” which I have found to be incorrect. Clearly MEETH, as a functioning acute care, specialty hospital, had value: major medical entities were willing to operate it and keep it open and guarantee the expenditure of substantial sums to do so. Thus, while it may be that the real estate was fairly valued, this is not enough. The transaction did not take into account MEETH’s full value, and the NYPH proposal to establish a MEETH pavilion or building, with “plaques and/or signage,” does not correct this since it does not necessarily contemplate preserving the business of MEETH, and therefore preserving the total assets of MEETH. Moreover, as I have also found, evidence at the hearing established that MEETH’s name itself had significant value. Again under the terms of the proposed transaction, this value is not evaluated nor is it clear that it will be preserved. The Board disregarded these components of value when it decided to “monetize” its assets and sell the real estate. This is a fundamental flaw which leaves me unsatisfied that the terms and conditions of the proposed transaction are “fair and reasonable.”
Under the second prong of section 511, which requires that “the purposes of the corporation * * * will be promoted” (N-PCL 511 [d]), MEETH’s petition fares no better. Unfortunately, there is lacking judicial precedent concerning a proposal of this magnitude.[9] While MEETH has argued that the proposal to abandon the acute care, teaching and research hospital *155 component of its mission and to pursue the D&T Centers does not require an amendment, this argument is belied by the Board’s own action on April 29th, authorizing submission of an amendment to its certificate of incorporation (although never submitted) expressly providing for the D&T Centers. This is behavioral evidence that the Board knew that it was proposing a fundamental change in the corporation’s mission, which indeed it was doing. For generations MEETH’s mission, as stated in its certificate of incorporation, was understood to be the operation of an acute care, specialty teaching and research hospital dedicated to “plastic surgery” and to the treatment of “persons suffering from diseases of the eye, ear, nose or throat.” While it is certainly correct that the definition of “hospital” contained in section 2801 (1) of the Public Health Law includes a diagnostic and treatment center, as MEETH now argues, it is sophistry to contend that this means that MEETH is not seeking a new and fundamentally different purpose, in light of the overwhelming evidence which demonstrates this is exactly what it is doing. The conclusion is inescapable that the proposed use of the assets involves a new and fundamentally different corporate purpose.
Before I turn to analysis of MEETH’s failure to establish that the proposed transaction will further its corporate purposes as required by section 511, a prescient passage from one text is instructive: “[A] hospital or clinic providing specialized services, that is so deeply in debt that its provision of services is seriously jeopardized, may wish to transfer its assets to another clinic or hospital providing basically the same services in return for assumption of its debt. The only alternative may be the protection of federal bankruptcy laws or a receivership under state law for the benefit of creditors.” (Bjorklund, op. cit., § 8-2 [b] [3], at 243.) While it may be appropriate, in certain cases, to solve financial difficulties by eliminating the organization’s mission by selling its assets and then undertaking a new mission, the passage properly focuses attention upon the duty of obedience, which mandates that a board, in the first instance, seek to preserve its original mission. Embarkation upon a course of conduct which turns it away from the charity’s central and well-understood mission should be a carefully chosen option of last resort. Otherwise, a board facing difficult financial straits might find sale of its assets, and “reprioritization” of its mission, to be an attractive option, rather than tak *156 ing all reasonable efforts to preserve the mission which has been the object of its stewardship.
As has been documented in the findings of fact, the record is clear that this case is not a situation where the Board first made a reasoned and studied determination that there was a lack of need for MEETH as a hospital, or that the financial difficulties made it impossible to ensure the survival of MEETH. Rather, the credible evidence is that MEETH’s decision to sell was impelled by MSKCC’s offer, which caused the Board to recognize the value of the underlying real estate; then its realization that it could “monetize” this asset drove subsequent events.
The MSKCC offer initially drove the decision to retain a strategic advisor, Shattuck Hammond, which had a direct and substantial interest in a sale of the real estate, i.e., the 1% transaction fee. This arrangement, regardless of whether it was traditional in investment banking, as Mr. Hammond testified, resulted in a situation where the Board put its reliance upon a strategic advisor which had an actual interest in the recommendations of its strategic study. It is not necessary for me to conclude that this conflict of interest compromised the result; the fee arrangement certainly gives the appearance that the integrity of the process was flawed and that the Board had not obtained the assistance of a truly independent expert. Moreover, there does not appear to have been full disclosure to the Board of the potential for a conflict of interest in the expert. The evidence showed that two Board members were unaware of the percentage fee which was a part of Shattuck Hammond’s retention. Additionally, there was no discussion or deliberation by the Board over the fact that its strategic advisor had a direct, and perhaps disabling, financial interest in the outcome of the strategic option it was recommending. Nor was there a decision by the Board to retain and rely upon Shattuck Hammond, notwithstanding this issue. The issue simply was never raised. As a result, it cannot be concluded with confidence that the Board received wholly disinterested advice. This becomes more troubling in view of the manner in which Shattuck Hammond dealt with bidders such as Continuum and Lenox Hill, which were not interested in purchasing the real estate, by providing misleading information concerning their offers, often omitting crucial details, and by asserting that the only realistic option was the sale of the real estate.
It is also clear that the MSKCC offer, which drove the decision to “monetize” the assets, drove the subsequent decisions *157 to create a new or “reprioritized” mission, to prematurely terminate the residency programs, to seek approval to close the Hospital, and virtually every other decision made by the Board, as I have detailed above.
This decision to “monetize” drove the need to change the corporate purposes, and these new or reprioritized purposes then became the basis for the argument that “purposes of the corporation * * * will be promoted.” A careful evaluation of whether there was a basis for changing the corporate purposes should have determined the need to sell, not vice versa. The total absence of any study beforehand, concerning the D&T Centers, and the retention of health care experts, only after submission of the proposal to the DOH, and only to prepare a business plan “for fulfillment” or in “support” of the D&T proposal, not to independently evaluate the plan’s feasibility, buttresses the conclusion that the sale drove the change in purpose. Indeed, the report submitted by Dr. Cicero and Mr. Kachmarick states that “[t]he following business plan describes how MEETH will achieve [its] goal, in keeping with its expanded mission statement.” To argue that MEETH was returning to its original purposes without an iota of evidence that it made this fundamental determination prior to the decision to sell and close, cannot obscure the fact that this decision, of necessity, eliminated MEETH’s historic mission, its historic raison d’etre.
Moreover, the record also demonstrates that the Board failed to properly consider the various alternatives submitted which would have preserved .MEETH’s mission. The Board had concluded that these alternatives were the equivalent of “giving the keys away,” and summarily rejected them.[10] However, the Board has no independent vitality. It appears that the Board confused preservation of the Hospital with preservation of the Board, when the appropriate calculus should be what is good for the Hospital is good for the Board. This is borne out by the testimony concerning Mr. Herkness’ promise to consider the additional Lenox Hill materials, and his bringing the matter to vote without advising the Board of this commitment to *158 Lenox Hill, which effectively foreclosed the Board from considering a proposal which would have preserved MEETH’s mission. It is borne out by Mr. Scibetta’s refusal to meet with Continuum in the presence of the AG, who is a statutory party to any section 511 petition, a decision acquiesced in by the Board. It also is borne out by the lack of interest in pursuing potential bidders who were willing to preserve MEETH. This conclusion is reinforced by the events on September 17, 1999 when Mr. Herkness inquired whether Continuum was willing to indemnify the Board and then refused to let Mr. Hyman examine the MSKCC Contract.
In sum, it is evident that this petition fails to meet the two-pronged test of section 511. The terms of the transaction are not fair and reasonable to the corporation, inasmuch as no consideration was given to the value of MEETH as a going concern; rather, this value was disregarded. Moreover, evaluating the transaction at the time of the petition, it is clear that there has not been a showing that the sale will promote the purposes of the corporation. To the contrary, MEETH decided to sell, and then evolved its new or “reprioritized mission.” There has been no reasoned determination that MEETH cannot continue to operate an acute care, specialty research and teaching hospital, as other medical institutions are proposing to do, and are willing to invest substantial sums to accomplish. MEETH instead chose to sell its real estate, to seek DOH approval to close its Hospital, and then apply for judicial imprimatur of this plan. I conclude that this sales transaction should be disapproved.
[Portions of opinion omitted for purposes of publication.]

. Interestingly, at the time that this authorization was extended, the full Board had not even considered whether a sale of assets was necessary or strategically prudent.

. Rule 13e-3 (e) (1) (17 CFR 240.13e-3 [e] [1]), promulgated pursuant to section 13 of the Securities Exchange Act of 1934 (15 USC § 78m), requires *133 the disclosure of various items, listed in schedule 13E-3 (17 CFR 240.13e-100), which is important in determining the fairness of a variety of corporate transactions. These statements are commonly referred to as a fairness opinion.

. According to Mr. Herkness, these budget proposals also led to the significant February 2, 1999 decision to defease approximately $16.2 million of Dormitory Authority of the State of New York (Dormitory Authority) bonds, which had been issued in a refinancing on August 1, 1997. The 1997 refinancing dropped the interest rate to below 5% which Mr. Herkness testified had saved the Hospital “almost a million dollars annually.”
The refinancing agreement provided that if the debt service ratio (essentially net income divided by interest payments) fell below 1.25, then the Dormitory Authority “may require the Hospital to employ a Hospital Consultant” and submit a report with regard to “actions to be taken by the Hospital to improve its management and financial position,” and if the ratio fell below 1.10 “for any two consecutive fiscal years,” then the Hospital “must immediately employ such a consultant, implement its recommendations,” and file a report.
Mr. Herkness testified that, since the proposed operating budgets forecast a drastic drop in the debt service ratio, it was decided that the bonds should be paid off in full. Thus, by “Unanimous Written Consent * * * In Lieu of a [Board] Meeting,” the Board resolved “to completely defease” the bonds. This required taking $9.4 million from cash reserves and using $6.8 million which had been withheld by the Dormitory Authority. Mr. Herkness was concerned that, if they fell below the ratio, MEETH would be forced into “paying off the bonds.” And Mr. Whitman thought “then presumably, you could be thrown into bankruptcy by the dormitory authority.” Passing the fact that a charitable hospital cannot be put into involuntary bankruptcy (11 USC § 303), and that the agreement provided graduated measures, it appears that there was *136 no effort to determine what action the Dormitory Authority would have taken. Astonishingly, at a time when MEETH was supposed to be facing financial “doomsday,” the bonds were paid off without determining how much investment income would be lost compared with the interest that would be saved as a result of paying off the bonds, and without ascertaining the position of the Dormitory Authority.
The refinancing also gave “the Authority * * * a first mortgage lien” on its real property to “secure all obligations and liabilities” under the loan agreement. This was a “condition precedent” to the issuance of the bonds. In its written consent, the Board stated that “the equity represented by such bond reserves can be more effectively utilized in connection with a prepayment of the mortgage * * * to give the Hospital greater flexibility and options in dealing with its financial needs.” This leads to the conclusion that the bonds were defeased as part of the plan to sell the real estate and is evidence that the emphasis was on sale, since if the Board was seeking means to preserve MEETH, defeasance may not have been desirable.

. MEETH agreed “not to solicit, initiate or encourage the submission by a third party of any competing proposal.”

. The origins of section 511 date to 1876 (Code Civ Pro of 1876 §§ 3390-3393, added by L 1890, ch 95); its lineage can be traced through General Corporation Law § 52 to 1969, when it became a part of the new Not-For-Profit Corporation Law (L 1969, ch 1066).

. This requirement was added in 1972 (L 1972, ch 961, § 6). Prior to this amendment, judicial decisions had required “fair market value” (e.g., Matter of St. Luke’s Hosp., 33 Misc 2d 888, 891 [Sup Ct, NY County 1962], supra).

. Before 1969, the court was required to be satisfied “that the interests of the corporation will be promoted” (General Corporation Law § 52). The newly enacted Not-For-Profit Corporation Law changed the statutory language to “the purposes of the corporation * * * will be promoted.” While no legislative history has been found for this change, it is in consonance with article 2 (Corporate Purposes and Powers), which for the first time defined a nonprofit corporation in New York (Wyckoff, Practice Commentaries, McKinney’s Cons Laws of NY, Book 37, Not-For-Profit Corporation Law § 201, at 43-44) and N-PCL 402, which requires, as did former law, that the certificate of incorporation set forth, inter alia, “the purpose or purposes for which it is formed.” (N-PCL 402 [a] [2].)

. The N-PCL was designed to reflect the Business Corporation Law as closely as the subject matter would permit. (See, Bjorklund, Fishman and Kurtz, New York Nonprofit Law and Practice: With Tax Analysis § 1-3 [c], at 15.)

. There are reported decisions dealing with somewhat complicated sales. (E.g., Matter of Agudist Council of Greater N. Y. v Imperial Sales Co., 158 AD2d 683 [2d Dept 1990] [sale disapproved where services provided to senior citizens will be disrupted], and Church of God v Fourth Church of Christ, Scientist, 76 AD2d 712, supra.) Such decisions generally deal with the impact *155 of the sale of the assets on the existing mission, and do not involve a concomitant proposal to change or reprioritize the existing mission.

. See Bjorklund (op. cit., § 8-2 [c], at 246, n 58), discussing when a charitable “business” is being transferred, and in exchange the acquirer is assuming all liabilities and guaranteeing continuation of the seller services and noting that the “value (i.e., total assets transferred) may be much greater than the consideration (i.e., liabilities assumed).” Neither Continuum nor Lenox Hill was proposing this scenario, as was suggested by the “keys” metaphor.