## NATIONAL CONFEDERATION OF AMERICAN ETHNIC GROUPS, Appellant,

v.

## John GENYS, et al., Appellees.

### No. 81–848.

District of Columbia Court of Appeals.

Submitted Sept. 9, 1982.

Decided Feb. 16, 1983.

Calvin Steinmetz, Washington, D.C., for appellant.

Gerald C. Baker, Lanham, Md., for appellees.

Before NEWMAN, Chief Judge, and NEBEKER and TERRY, Associate Judges.

TERRY, Associate Judge:

This appeal is the latest chapter in a long-standing dispute between two factions within a public service organization. At issue here is the validity of certain actions taken by two conventions, each purporting to act in the name of the organization. The trial court, ruling on requests by both factions for declaratory and injunctive relief, held that the first convention in October 1978 had been unlawful and invalidated all actions taken there, including the election of new officers. It also held that the second convention in April 1979 and the election of officers at that convention had been lawful, and enjoined those persons elected in October 1978 from acting or representing themselves as officers. We affirm the trial court's ruling in all respects.

I

The National Confederation of American Ethnic Groups (NCAEG) is a non-profit corporation organized under the laws of the District of Columbia. It was founded in 1957 "to unite the many ethnic groups, who are a vital component part of American society, irrespective of racial or national origin, creed or color, to the end that they may become better citizens of the United States of America" (Preamble, NCAEG Constitution). The members of NCAEG are themselves organizations comprised of persons with various ethnic backgrounds, such as the Lithuanian-American Council and the Romanian-American National Congress. NCAEG flourished under the leadership of Paul Deac, its founder and for many years its Executive Vice President. After Mr. Deac's death in 1975, a convention was held at which Dr. John Genys was elected President of NCAEG. Six Vice Presidents were also elected, two of whom were Joseph Valletutti and Alexander Ronnett. Early in 1977 the Secretary-Treasurer of NCAEG resigned, and Aristide Nicolaie was appointed by the National Executive Council to fill the vacancy.

Between February and June 1978 several letters were sent to all of the forty-two organizations which had participated in the 1975 convention, announcing another convention to be held in October 1978 and attempting to arouse interest in it. The last of these letters, dated June 22, 1978, and signed by Secretary-Treasurer Nicolaie, asked each member organization to fill out a membership information form and return it with its dues by July 15. Only eleven organizations responded and paid their dues before this deadline.

Meanwhile, friction began to develop between Mr. Nicolaie and Dr. Genys. Sometime in the summer of 1978 Mr. Nicolaie removed certain records from the NCAEG offices, forcing President Genys to postpone the October convention.[1] Mr. Nicolaie and a group of his supporters, however, still wanted the convention to be held on schedule, apparently with the hope of replacing most of the officers, including Dr. Genys. Thus Mr. Nicolaie determined that even though forty-two member organizations had sent delegates to the 1975 convention, he would be obliged as Secretary-Treasurer to contact only the eleven organizations which had paid their dues in 1978 to see whether a majority of them still wanted a convention to be held in October.[2] Accordingly, he notified those eleven organizations to send representatives to a meeting in New York on August 7. Eight organizations did

1. Genys also suspended Nicolaie from his post as Secretary-Treasurer. The suspension was later upheld by the National Executive Council, which removed Nicolaie from office.

2. Article IX, Section 1 of the NCAEG constitution provides that a special convention may be called if a majority of the member organizations requests it. Mr. Nicolaie concluded that the thirty-one organizations which had not paid their dues by July 15, 1978, had "seceded" from NCAEG.

so, and at the meeting this group of eight, which included Mr. Nicolaie as well as Vice Presidents Ronnett and Valletutti, determined that NCAEG had only eleven members and that they represented a majority of the membership. They therefore called a special convention for October 7 and 8 and so informed President Genys, who reacted to the news by notifying all members by letter that such a convention would be in violation of NCAEG's constitution and that they should not attend. The convention was nevertheless held, and new officers were elected, including Nicolaie, Ronnett, and Valletutti.

President Genys continued to run the affairs of the organization despite the activities of the new officers, who tried to appropriate NCAEG's bank account and interfered with his attempts to hold meetings. On February 27, 1979, Genys met with some of the other pre-1978 officers and began to make plans for a convention to be called in April. A meeting of the National Executive Council was scheduled for March 24. Notice of that meeting was sent to all the officers elected in 1975, including Ronnett and Valletutti, and to the presidents of all affiliated national organizations. At the March meeting the plans for an April convention were approved, and some new organizations were admitted to membership in NCAEG.

On March 15, 1979, less than twenty minutes apart, two suits were filed in the Superior Court, both in the name of NCAEG. The first suit, brought by Mr. Nicolaie and his supporters (whom we shall hereafter call the "new officers"), sought an injunction against Dr. Genys and two others requiring them to refrain from holding themselves out and purporting to act as officers of NCAEG, as well as a declaratory judgment that the new officers were the only lawful ones. The second suit, brought by Dr. Genys and others (the "old officers"), sought similar relief against the new offi-

cers. The two cases were consolidated, and on March 28 Judge Stewart granted the old officers' motion for a preliminary injunction, making it possible for the April convention to proceed on schedule. The convention was held, and President Genys was reelected. In due course the two cases came on for trial on the merits before Judge Mencher, who made detailed findings of fact and again ruled in favor of the old officers, granting them a permanent injunction against the new officers and declaring that the April 1979 convention was valid and that the persons elected in April 1979 were the lawful officers of NCAEG.

II

Under Article IX, Section 1 of the NCAEG constitution, a special convention may be called in any of three ways: "by direction of a regular Convention, by order of the Executive Council, or on request of national organizations, state or local NCAEG chapters representing a majority of the total membership of [NCAEG] as evidenced by the records of the national headquarters in Washington, D.C." Appellants[3] sought to call a convention in October 1978 by the third method, that is, by request of a majority of the total membership. Where they went astray was in their determination that NCAEG had only eleven members.

Article IX of the NCAEG constitution provides in pertinent part:

Section 7. Organizations that have seceded or have been suspended or expelled by this Confederation, its chapters and affiliates shall, while under such penalty, not be permitted representation or recognition in NCAEG or in any subordinate body thereof.

Section 8. No chapter or affiliate which, at the opening date of the Convention, is in arrears in payment of its membership fee to the Confederation or in payment of any other financial obliga-

---

3. Although this appeal is brought in the name of NCAEG, the real parties in interest are Mr. Nicolaie and the rest of the new officers, who are asserting the right to act on behalf of NCAEG. We shall therefore refer to the new officers as "appellants."

tions, for two months or more, shall be entitled to recognition or representation in the Convention.

Mr. Nicolaie concluded, and appellants here contend, that those member organizations which failed to pay their dues before July 15, 1978, had "seceded" from NCAEG. There is no basis in the NCAEG constitution for such a conclusion. The term "seceded" is found only in Article IX, Section 7, and is nowhere else defined or even mentioned. We need not attempt to define exactly what constitutes a secession, for we can say with assurance that the plain language of Section 7 ("Organizations that have seceded") implies some voluntary action on the part of a once active member to sever its ties with NCAEG. There is no evidence that any of the forty-two member organizations voluntarily withdrew from NCAEG; in fact, Mr. Nicolaie conceded in his testimony before Judge Stewart that his decision that thirty-one organizations had "seceded" was "a decision by implication."

■ The NCAEG constitution sets forth no requirement for the timely payment of dues. ·Article IX, Section 8 provides only that any member whose dues are two months or more in arrears "at the opening date of the Convention ... shall [not] be entitled to recognition or representation in the Convention." Thus the fact that a member has not paid its dues does not affect its status as a member of NCAEG, but only its right to be recognized or represented at a convention. Furthermore, under Article VI of the NCAEG constitution, once a charter is issued to an eligible organization, it may be suspended from membership

only "by a majority roll call vote by the Executive Council and confirmed by the National Assembly of Representatives." It follows, therefore, that in July and August 1978 there were forty-two member organizations in NCAEG, not eleven. Thus the convention in October 1978, which was called in August at the request of eight members, was not a valid convention because it was not requested by a majority of the forty-two members of NCAEG, and all of the actions taken by that convention, including the election of the new officers, were null and void.[4]

### III

■ Appellants argue that the use of proxy voting by the old officers at several meetings following the October 1978 convention, including the meeting of the National Executive Council in March 1979 which approved the plans for a convention in April, was not authorized by the NCAEG constitution or otherwise.[5] As a result, they contend, the April 1979 convention was unlawfully called, and its actions, including the election of officers (i.e., Dr. Genys and the rest of the old officers), were invalid. The trial court held that the April 1979 convention was lawful and its actions valid.

The governing statute for non-profit corporations, D.C.Code § 29–516(b) (1981), provides in part:

A member may vote in person or, unless the articles of incorporation or the bylaws otherwise provide, may vote by proxy executed in writing by the member or his duly authorized attorney-in-fact.[6]

4. There is yet another defect in the calling of the October 1978 convention. Article IX, Section 15 of the NCAEG constitution provides in part:

Prior to the opening date of the Convention, the National Assembly shall meet and constitute itself or a committee or subcommittee as the Credentials Committee for the Convention.

Appellants do not contend that the participants in the August 7 meeting in New York constituted a Credentials Committee for the convention, nor could they so contend on the facts of this case. Thus, regardless of whether payment of

dues by a certain deadline was a prerequisite to membership, Mr. Nicolaie and the others at the August 7 meeting had no authority under the constitution to determine what members were eligible to attend the October convention.

5. It is apparently undisputed that proxies were needed to make a quorum at each of these meetings.

6. The corresponding statute for business corporations, D.C.Code § 29–327(c) (1981), contains similar but not identical language.

Because the NCAEG constitution is totally silent on the subject of proxies, we need not look beyond the statute to uphold their use in this case. But even if the statute were not on the books, there is case law to the effect that "long and continuous usage" of proxy voting has the force and effect of a bylaw. *Walker v. Johnson,* 17 App.D.C. 144, 163 (1900); *see, e.g., In re Tidewater Coal Exchange,* 280 F. 638, 646 (2d Cir. 1922); *Hatch v. Emery,* 1 Ariz.App. 142, 144, 400 P.2d 349, 351 (1965). The trial court found that the use of proxies at NCAEG meetings and conventions had been accepted through long-established custom and usage.

There was ample evidence to support this finding. The minutes of the challenged meetings reflect that proxy voting was standard procedure, and as far as the record discloses, appellants presented no evidence to the contrary.[7] Furthermore, in a letter to President Genys dated April 6, 1979, concerning the upcoming convention, Vice President Ronnett stated, "I, most probably, will be only present on Sunday, April 29. During my absence, I will appoint a proxy." Thus even one of the appellants [8] acknowledged that the use of proxies was appropriate.

The trial court's ruling is supported by statute, by case law, and by the evidence of record. We therefore hold that the officers elected at the April 1979 convention were lawfully elected and that they, or their successors, are the only persons authorized to act as officers of NCAEG.

*Affirmed.*[9]

---

**7.** Appellants have not provided this court with a transcript of the evidence before Judge Mencher at the trial on the merits. The only evidence in the record consists of the testimony before Judge Stewart at the hearing on the motion for a preliminary injunction, plus a number of documentary exhibits. In his findings of fact, however, Judge Mencher expressly relied upon the evidence before Judge Stewart as well as the testimony he had heard himself. We can therefore rule that the evidence of record supports Judge Mencher's findings, while at the same time noting that appellants have not met their burden of demonstrating that those findings were erroneous. *See Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C. 1982).

**8.** See note 3, *supra.*

**9.** We deny appellees' request that the costs of this appeal be taxed against appellants. Each side shall bear its own costs.