# District of Columbia
# Court of Appeals

No. 14-CV-0094

FAMILY FEDERATION FOR WORLD PEACE AND
UNIFICATION INTERNATIONAL, *et al.*



FILED

DEC 24 2015

DISTRICT OF COLUMBIA
COURT OF APPEALS

Appellants and Cross-Appellees,

v.                                                              CAB-3721-11

HYUN JIN MOON, *et al.*,

Appellees and Cross-Appellants.

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE: Glickman and Blackburne-Rigsby, Associate Judges; and Steadman, Senior Judge..

## J U D G M E N T

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the order of the trial court, denying defendants' motion to dismiss, is affirmed; the order of the trial court, granting defendants' motion for judgment on the pleadings, is reversed; and the case is remanded for further proceedings consistent with this opinion.

For the Court:

*Tracy B. Dutall*

*for* JULIO A. CASTILLO
Clerk of the Court

Dated: December 24, 2015.

Opinion by Senior Judge John Steadman.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## No. 14-CV-94

FAMILY FEDERATION FOR WORLD PEACE AND UNIFICATION INTERNATIONAL, ET AL.,
APPELLANTS AND CROSS-APPELLEES,

v.

HYUN JIN MOON, ET AL., APPELLEES AND CROSS-APPELLANTS.

Appeals from the Superior Court
of the District of Columbia
(CAB-3721-11)

(Hon. Natalie M. Combs Greene, Motions Judge)
(Hon. Anita Josey-Herring, Trial Judge)

(Argued March 10, 2015                    Decided December 24, 2015)

*Alan I. Horowitz*, with whom *James A. Bensfield*, *Emmett B. Lewis*, *Brian A. Hill*, *John C. Eustice*, *Benjamin P. De Sena*, *Thomas C. Green*, *Frank R. Volpe*, *George W. Jones Jr.*, *W. Gary Kohlman*, *Jeffrey R. Freund*, *Ramya Ravindran*, and *Philip C. Andonian*, were on the brief, for appellants/cross-appellees.

*David A. Reiser*, with whom *Steven M. Salky*, *Blair G. Brown*, *Caroline E. Reynolds*, *Amit P. Mehta*, *Adam B. Abelson*, *Keisha N. Stanford*, *Peter J. Romatowski*, *Adrian Wager-Zito*, *Shay Dvoretzky*, *Yaakov Roth, and Francis D. Carter*, were on the brief, for appellees/cross-appellants.

Before GLICKMAN and BLACKBURNE-RIGSBY, *Associate Judges*, and STEADMAN, *Senior Judge*.

STEADMAN, *Senior Judge*: Before us is a dispute over legal control of a District of Columbia nonprofit corporation, originally named the Unification Church International ("UCI"),[1] established in 1977 under the auspices of the Reverend Sun Myung Moon, founder of the Unification Church. UCI has received very substantial contributions in the past from entities under the greater Unification Church umbrella and manages millions of dollars in assets. Succinctly put, plaintiffs' complaint involves allegations that defendants undertook a series of coordinated and calculated illegal actions to usurp UCI and its corporate assets and wrest control of UCI from the Unification Church.[2]

On direct appeal, plaintiffs appeal the trial court's grant of the defendants' motion for a judgment on the pleadings for lack of subject-matter jurisdiction.[3] The judgment was based on the trial court's view that the dispute could not be

---

[1] In 2010, the corporation's Articles of Incorporation were amended to change the name from "Unification Church International" to "UCI." The motivation behind the corporation's decision to amend its Articles is in dispute. For simplicity, we refer to the entity as UCI throughout this opinion.

[2] The plaintiffs in this action are two ousted former directors of UCI and three entities with close interests in the operation of UCI, all as explained in more detail in part I (B) *infra*. The defendants are UCI itself and its five current directors.

[3] As part of its order, the trial court dismissed the complaint with prejudice, subject to the completion of certain collateral matters.

decided without the court's venturing into religious questions forbidden by the First Amendment. On cross-appeal by the defendants is an earlier order by the trial court refusing to dismiss the complaint on the asserted grounds of lack of personal jurisdiction, lack of standing, and failure to state a cause of action.

On the direct appeal, we conclude that the grant of judgment on the pleadings prematurely resolved the constitutional issue. On the cross-appeal, we affirm the order of the trial court.

## I. UCI and Plaintiffs' Allegations[4]

### A. The Founding of UCI

In a broad sense, the current dispute stems from the founding by Reverend Moon of the Holy Spirit Association for the Unification of World Christianity (the "Unification Church"), in Seoul, South Korea, in 1954. In 1971, Reverend Moon moved from South Korea to the United States to expand the Unification Church's

---

[4] We here set forth the facts as alleged in the complaint. The defendants filed a counterclaim with a markedly different view of events. This counterclaim was eventually dismissed, creating finality for the instant appeals.

activities around the globe. Two years later, in 1975, Reverend Moon directed his close associate, Dr. Bo Hi Pak, to "open a bank account with Diplomat National Bank in the District of Columbia in the name of Unification Church International." The first sum deposited in the account came from an account in Reverend Moon's name, and additional funds were contributed by various other Unification Church entities. Reverend Moon "directed Dr. Pak to hold the funds in the [UCI] bank account in trust solely for the benefit and support of the Unification Church and its related activities." As a key assertion, plaintiffs argue that Reverend Moon's statements and actions demonstrate the intent to create an oral, charitable trust with Dr. Pak serving as the trust's first trustee ("UCI Trust").

By 1977, approximately $7,000,000 had been donated and was held in the UCI bank account. Reverend Moon then directed Dr. Pak to establish a District of Columbia nonprofit corporation to implement the UCI Trust and carry out its purpose. Thus, UCI came into being in that year. Dr. Pak changed the UCI Trust's bank account to reflect that the donated funds would be held by UCI, as opposed to the trust itself. Reverend Moon intended for this corporation to "implement the purposes of the trust and for the Directors of the Corporation to serve as trustees and ensure that the Corporation and its assets would be administered for the benefit of the Unification Church."

The original February 1977 Articles of Incorporation are alleged to "reflect[] the purposes" of the corporation and "evidence" Reverend Moon's intent. Specifically, Article 3, Section 2 of the Articles of Incorporation stated that the UCI will "serve as an international organization assisting, advising, coordinating, and guiding the activities of Unification Churches organized and operated throughout the world." Furthermore, Section 3 stated that the UCI will "promote the worship of God, and to study, understand and teach the Divine Principle, the new revelation of God, and, through the practical application of the Divine Principle . . . achieve the interdenominational, interreligious, and international unification of world Christianity and all other religions." Additionally, Article 9 also stated that the Directors of UCI "recognize and acknowledge that the Reverend Sun Myung Moon has provided the inspiration and spiritual leadership for the founding of the Corporation and is the spiritual leader of the international Unification Church movement." Plaintiffs assert that the Divine Principle is the theological textbook of the Church and contains the essential teachings of Reverend Moon.

From 1977 to 2006, UCI operated without controversy.[5]  From 1977 through 1992, Dr. Pak, as the president of the corporation, managed the corporation's assets, to which various entities, notably one in Japan that is a plaintiff in this action, donated "hundreds of millions of dollars" allegedly to be "held in trust" and used for the Church's endeavors.  Both Dr. Pak and plaintiff Dr. Douglas D.M. Joo, who served as President of UCI from 1992 to 2005, understood that the corporation held its assets to fund the Church's activities.

Things changed radically beginning in 2006, when Preston Moon,[6] one of Reverend Moon's sons, became the new president of the UCI as well as one of the five directors.  Two years later, Reverend Moon appointed another son, Sean Moon, as the next leader of the Church's worldwide religious organization.  This appointment allegedly disappointed Preston Moon, who "resolved not to take direction from his younger brother Sean Moon in matters relating to UCI,"  and led Preston Moon to take a series of actions to divest the Church of control over UCI and divert the corporation from its alleged mission and intended purpose.

---

[5] In 1980, UCI gave up its original tax-free status.

[6]  The named defendant is "Hyun Jin Moon (a/k/a Preston Moon)."  The complaint consistently refers to him as Preston Moon, and we follow that practice here because the complaint is the focus of attention.

Plaintiffs' challenge to those actions by Preston Moon and the other directors is the subject of this law suit.

**B. Plaintiffs' Claims**

Five plaintiffs are linked in this case. Three of them are entities related to Reverend Moon's original Unification Church. The first entity is the lead plaintiff, Family Federation for World Peace and Unification International ("Family Federation") that is located in South Korea and is the current name for the religious entity that directs the church's activities worldwide and is now headed by Sean Moon.[7] The second entity is the Holy Spirit Association for the Unification of World Christianity (Japan) (the "Japanese Church"), which is the "corporate embodiment" of the Universal Church in Japan and was the primary donor of funds to UCI for several decades. The third entity is the Universal Peace Federation, a District of Columbia nonprofit corporation, which was a long-time major recipient of funding from UCI prior to the takeover by Preston Moon. The other two plaintiffs, Dr. Douglas D.M. Joo and Peter H. Kim, are individuals who were

---

[7] As the trial court noted, when and how this succession occurred is not clear from the record. When naming his son Sean Moon as the next leader of the Church, Reverend Moon also named Sean Moon as the international president of Family Federation. Reverend Moon himself died at the age of 92 on September 3, 2012.

directors of UCI until ousted by Preston Moon. Plaintiffs challenge virtually all of the actions taken by Preston Moon and UCI since he gained control, summarized as follows.[8]

Plaintiffs first challenge the actions taken to secure control of the corporation's Board of Directors. Under its by-laws, the corporation (which had no members or stockholders) functioned under the supervision of a five-person self-perpetuating Board of Directors. Plaintiffs assert that although the written by-laws provide that the Board of Directors shall elect successor directors, Reverend Moon, as the co-settlor of the trust and spiritual leader of the Church, had designated all individuals to serve on the Board of Directors of UCI. Plaintiffs further assert that the directors have "understood and accepted" this "long and continuous usage of this uniform practice" that constitutes a "binding convention" as to how the directors are to be nominated.

In January 2009, Preston Moon held a UCI board meeting during which he arranged for the resignation of two of the five original directors and the election of defendants Michael Sommer and Richard Perea to the Board of Directors. Preston

---

[8] Plaintiffs' complaint runs to forty pages plus a number of attachments. We summarize the major assertions of wrongdoing.

Moon and his hand-picked directors allegedly stymied an effort by directors Joo and Kim to elect directors designated by Reverend Moon, which contravened the longstanding, uniform custom and practice of Reverend Moon nominating the individuals to be directors of the corporation. Preston Moon completed his takeover of the UCI Board of Directors in August 2009, when he convened a special board meeting where he, Sommer, and Perea voted to remove directors Joo and Kim from the Board of Directors.[9] Defying instructions from the Family Foundation to reinstate the removed directors, Preston Moon, Sommer, and Perea instead added two of Preston Moon's brothers-in-law to the Board of Directors. Plaintiffs contend that these steps constituted "unauthorized, illegal and improper actions" that vitiated the validity of subsequent UCI corporate acts.

Next, plaintiffs challenge the diversion of corporate expenditures from the purposes set forth in the trust imposed on the corporation and in the original articles. In late 2009 and early 2010, Preston Moon was stripped of his positions on several Church entities. In response to this, Preston Moon announced that he would act through an entity known as the Global Peace Festival Foundation ("GPFF"), which he had created in 2009. Preston Moon further indicated that

---

[9] The by-laws of the corporation permitted a majority of the Board to remove any director with or without cause.

GPFF would have no formal or legal association with the Family Federation, Universal Peace Foundation, or the Unification Church. This resulted in the Universal Peace Foundation no longer receiving funding from UCI as it had for decades. Preston Moon then began holding "Global Peace Festivals" through GPFF and used UCI corporation assets to fund the activities, in defiance of the wishes of Reverend Moon and the Family Foundation. In furtherance of his plan, on April 14, 2010, Preston Moon and the UCI Board of Directors, which he now controlled, amended the UCI Articles of Incorporation to disassociate the corporation from the Church, specifically by changing the name from "Unification Church International" to "UCI" and removing all references to the original purpose of advancing the Divine Principle and supporting Unification Churches worldwide. As amended, the Articles of Incorporation provided more generally only for promotion and support of the Unification Movement.

Third, plaintiffs charge that Preston Moon used his powers as President and Chairman of UCI to engage in self-dealing transactions and to divert corporation assets for his own interests, in violation of his fiduciary duties and of the District of Columbia Nonprofit Corporation Act. Among other allegations, plaintiffs assert that Preston Moon caused a UCI subsidiary to engage in a property transaction with an entity wholly owned by Preston Moon at less than fair market value, and

that the transaction served no legitimate business purpose. Plaintiffs also allege that Preston Moon caused UCI to lend $2,000,000 to that entity owned by him and to enter into a consulting agreement with it to pay $120,000 a month when the consulting agreement served no legitimate business purpose.

The plaintiffs' complaint primarily relies on four legal theories, each set forth in a separate count of the complaint, in challenging these allegedly wrongful actions taken by Preston Moon and UCI. The first two counts, raised by all plaintiffs, are breach of the trust established by Reverend Moon with Dr. Pak, and breach of corporate fiduciary duties and ultra vires acts. The third count, raised only by Family Federation, is breach of fiduciary duty by Preston Moon as an agent of Family Federation, the principal.[10] The fourth count, raised only by the Japanese Church, is breach of contract relating to its provision of funds to UCI.[11]

With this background of events, we turn now to the appeals before us. As disposition of the cross-appeal could potentially be outcome-determinative apart

---

[10] The other four directors are charged with aiding and abetting Preston Moon.

[11] The Japanese Church also raises quasi-contractual claims of promissory estoppel and unjust enrichment as related bases for recovery. We see no need to separately address these counts.

from the merits, we first address the challenges raised in the cross-appeal asserting lack of personal jurisdiction, lack of standing, and failure to state a claim.

## II. Personal Jurisdiction, Standing, and Failure to State a Claim

### A. Personal Jurisdiction

Each of the five individual defendants was a director of UCI during part or all of the time of the alleged wrongdoings and, according to the heading of the complaint, was a resident of the United States. However, none was a resident of the District. Accordingly, the trial court's exercise of jurisdiction rests on the District's Long Arm Statute—"more particularly, the provision that the District's courts 'may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's transacting any business in the District of Columbia.'" *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 727 (D.C. 2011) (quoting D.C. Code § 13-423 (a) (2001 ed.)). "We have repeatedly reaffirmed" that the "transacting business provision [of the District's Long Arm Statute] is coextensive with the due process clause of the Fifth Amendment." *Id.* (internal quotation marks removed); that is, jurisdiction extends as far as the due process clause permits. *Flocco v. State Farm Mut. Auto. Ins. Co.*,

752 A.2d 147, 162 (D.C. 2000). "[A] nonresident defendant need not have been physically present in the District" for our courts to exercise personal jurisdiction. *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981). Rather, the critical issue is whether the individual's "conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Daley*, *supra*, 26 A.3d at 727 (quoting *Gonzalez v. Internacional de Elevadores, S.A.*, 891 A.2d 227, 234 (D.C. 2006)). In other words, the inquiry is whether maintenance of the suit against defendants "offend[s] 'traditional notions of fair play and substantial justice.'" *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 330 (D.C. 2000) (en banc) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The defendants rely on the Supreme Court case of *Shaffer v. Heitner*, 433 U.S. 186 (1977) for the proposition that asserting jurisdiction over nonresident directors of a forum-state corporation is inconsistent with due process.[12] But, as

---

[12] In *Shaffer*, Delaware law conferring jurisdiction via sequestration of the defendant's property in that state "to compel the personal appearance of a nonresident defendant" was used by a plaintiff who owned one share of stock in a Delaware company and attempted to bring a derivative suit against the company and various officers and directors. The Court held that the principles of fairness and substantial justice from *International Shoe* also apply to an in rem proceeding, which under Delaware law and the facts of the case was insufficient to confer jurisdiction.

the Fourth Circuit rightly observed in *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522 (4th Cir. 1987), the *Shaffer* case was based on Delaware's assertion of jurisdiction based on property owned by the directors in that state, not on an assertion of jurisdiction based on a long-arm statute. Nor can these defendants benefit from the so-called corporate fiduciary shield, whereby "[a] court does not have jurisdiction over individual officers and employees of a corporation just because the court has jurisdiction over the corporation." *Flocco*, *supra*, 752 A.2d at 162. However the doctrine may operate in normal circumstances, we have declined to adopt an "absolute fiduciary doctrine" that would amount to "a per se rule that an employee's acts in his official capacity may never give rise to personal jurisdiction over him." *Id.* at 163 n.20. Accordingly, our analysis is not a "mechanical test"; instead, we weigh the facts of each case. *Holder v. Haarmann & Reimer Corp.*, 779 A.2d 264, 270-71 (D.C. 2001) (citation omitted).

The case before us is somewhat akin to our decision in *Daley*. In that case, we upheld jurisdiction over the nonresident individual officers of a District of Columbia nonprofit corporation who were alleged to have enriched themselves without proper authority. *Daley*, *supra*, 26 A.3d at 728. While it is true that in certain respects, the individual officers in *Daley* had been present in the District,

the association itself consisted of a wide membership, unlike the structure of UCI. In the case before us, each defendant voluntarily undertook to serve as a director of a nonprofit District corporation without members or stockholders, and where the directors were self-perpetuating and in total control of the corporation, answerable only to themselves. The plaintiffs' allegations are that these directors participated in wrongful activities going to the very essence of that corporation's existence. Furthermore, apart from the fact that all the alleged wrongdoing affected a District of Columbia corporation, at least one of those acts and a significant one, the allegedly wrongful amendment of the Articles of Incorporation, indubitably occurred within the District by filing here.[13]  On the alleged facts of this case, we have little difficulty in concluding these directors clearly could anticipate being hauled into [a District of Columbia] court to account for their activities and that doing so does not violate notions of fair play and substantial justice.

---

[13] "Once, however, the claim is related to acts in the District, § 13-423 does not require that the scope of the claim be limited to acts within the District." *Shoppers Warehouse*, *supra*, 746 A.2d at 326 (quoting *Cohane v. Arpeja-California, Inc.*, 385 A.2d 153, 158-59 (D.C. 1978)).

## B. Standing and Failure to State a Claim

Although challenges based on lack of standing and failure to state a cause of action pursuant to Super. Ct. Civ. R. 12 (b)(6) are conceptually distinct, the interrelationship of the two in the case before us makes it useful to discuss both challenges together.[14] We first address the first two counts brought by all five plaintiffs, resting on legal principles relating to trusts and to corporate fiduciary duties and ultra vires acts. Next, we address the count of breach of fiduciary duty as agent brought by Family Federation. Finally, we examine the contractual count brought by the Japanese Church.

### 1. Claims of Breach of Trust and Corporate Fiduciary Duties

In contesting plaintiffs' standing on the first two counts, the defendants primarily invoke the traditional rule that, generally, with respect to charitable trusts and charitable corporations "only a public officer, usually the state Attorney General, has standing to bring an action to enforce the terms of the trust." *Hooker*

---

[14] The defendants' brief addresses the standing issues under the heading of failure to state a claim.

*v. Edes Home*, 579 A.2d 608, 612 (D.C. 1990).[15] As we explained, this restriction primarily flows from the "impossibility of establishing a distinct justiciable interest on the part of a member of a large and constantly shifting benefited class, and the recurring burdens on the trust res and trustee of vexatious litigation that would result from recognition of a cause of action by any and all of a large number of individuals who might benefit incidentally from the trust." *Id.*

However, an important exception to the general rule exists "in situations where an individual seeking enforcement of the trust has a 'special interest' in continued performance of the trust distinguishable from that of the public at large." *Id.* While "special interest" is a term of uncertain scope, the key consideration, discussed at length in *Hooker*, is whether finding a justiciable interest in a given plaintiff would contravene the considerations underlying the traditional rule. *Id.* at 612. The exponential expansion of charitable institutions justifies a reasonable relaxation of any rule limiting enforcement to a busy Attorney General.

---

[15] That case involved a charitable corporation, but we have recognized the applicability of the rules relating to charitable trusts to such corporations. *See Owen v. Board of Dirs. of the Washington City Orphan Asylum*, 888 A.2d 255, 260 (D.C. 2005) [hereinafter *WCOA II*]("[W]e held that rules governing charitable trusts could be applied to charitable corporations, thus giving the Directors standing to sue.").

We are quite satisfied that, in the circumstances here, each of the plaintiffs has the requisite "special interest" to provide it with standing to contest the complained-of actions by the defendants under both the trust and corporate wrong-doing theories.

Two of the plaintiffs are the ousted directors. They occupy a status both as the alleged successor trustees to the Moon trust and as directors of a charitable corporation akin to a charitable trust.[16] *See Board. of Dirs. of the Washington City Orphan Asylum v. Board of Trs. of the Washington City Orphan Asylum*, 798 A.2d 1068 (D.C. 2002) (explaining special interest exception for former directors challenging their ouster); *WCOA II*, *supra* note 13, 888 A.2d at 260. Family Federation asserts an interest in several capacities: as successor in interest to Reverend Moon and his role as settlor of the trust,[17] in nominations of directors,

---

[16] In addition to finding that the ousted directors have special interest standing, we also conclude that they fall within the definition of "among others" in D.C. Code § 19-1304.05 (2012 Repl.) for enforcement of charitable trusts, and may "maintain a proceeding to enforce the trust." The District of Columbia is one of many jurisdictions that has adopted the Uniform Trust Code ("UTC"). D.C. Code § 19-1307.03 (g) (2012 Repl.), which establishes that when co-trustees are appointed to act as stewards of a trust, "[e]ach trustee shall exercise reasonable care to . . . [p]revent a co[-]trustee from committing a serious breach of trust; and . . . [c]ompel a co[-]trustee to redress a serious breach of trust."

[17] *See* D.C. Code § 19-1304.05 (c) (2012 Repl.) ("The settlor of a charitable trust, among others, may maintain a proceeding to enforce the trust.").

and as an overarching superior and benefiting entity in UCI's proper role to further the mission of Family Federation and the Unification Church. The Universal Peace Foundation was a major beneficiary from UCI for three decades, comfortably falling within the *Hooker* requirement that a beneficiary be in a class limited in number and that the nature of the challenge be to an extraordinary measure.[18] Furthermore, in *Hooker*, the plaintiffs granted standing were not even current beneficiaries of the charitable corporation, only prospective ones, quite contrary to the Universal Peace Foundation's long--term status here. And the contributions by the Japanese Church go far beyond the asserted rule that donors ordinarily cannot sue charities unless they restrict their gifts, as we discuss in subpart 3 *infra*.[19]

The defendants argue, however, that even if the plaintiffs have standing, "the complaint does not allege facts permitting plausible inferences that UCI is governed by a secret trust, by-law, and agency agreement that are each inconsistent with its formal and legally-binding Articles of Incorporation and By-laws." This

---

[18] All plaintiffs are challenging an extraordinary measure—fundamentally changing the purpose of UCI and taking steps to divest itself from the Unification Church.

[19] In addition, the Japanese Church alleges that it was a co-settlor of the trust.

argument essentially mirrors the fallacy in limiting considerations to formal documents discussed in the abstention context in part III (B)(1) *infra*. We see no inherent reason why any of the allegations in the complaint should be dismissed at this point as utterly implausible, given the legal doctrines governing the counts set forth.

To survive a 12 (b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Grimes v. District of Columbia*, 89 A.3d 107, 111-12 (D.C. 2014) (quoting *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011) (internal quotations omitted)). The facts pleaded must amount to more than simple legal conclusions, *id.* at 112, *i.e.*, "more than an unadorned, the-defendant-unlawfully-harmed-me accusation[s]," *Potomac Dev. Corp.*, *supra*, 28 A.3d at 544, and when well-pleaded, we "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Grimes*, *supra*, 89 A.3d at 112 (citation omitted).

In particular, defendants contend that plaintiffs' claim must fail because they failed to plead sufficient facts to plausibly establish that Reverend Moon intended to create an oral trust in 1975, and that the trust was extinguished when UCI came

into existence as a corporation. However the evidence may eventually turn out to be, we are not persuaded that any decision on this issue can be based on an inadequacy in the complaint. A writing is not required to create a valid trust. Intent may be established by "written or spoken language or by conduct, in light of all surrounding circumstances." *Cabaniss v. Cabaniss*, 464 A.2d 87, 91 (D.C. 1983). And it is not implausible that the establishment of UCI was intended to continue the trust in corporate form. The trustee of a trust has the "[p]ower to form a corporation or other entity . . . for the purpose of carrying on business or investment activities of the trust" and the trustee's various fiduciary duties apply "to operation of the entity." Restatement (Third) of Trusts § 86 cmt. e (2007). Moreover, unlike the situation in *Save Immaculate/Dunblane, Inc. v. Immaculata Preparatory Sch. Inc.*, 514 A.2d 1152, 1157 (D.C. 1986), relied on by defendants, here the alleged trust can be viewed as not in conflict with the Articles of Incorporation of UCI, but rather a direction for their exercise.

## 2. Breach of Fiduciary Duty as Agent

"Whether an agency relationship exists in a given situation depends on the particular facts of each case." *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000) (citing *District of Columbia v. Hampton*, 666 A.2d 30, 38 (D.C. 1995)). As

already indicated, the complaint identifies Family Federation as the entity that directs Unification Churches worldwide. It asserts that the Church designates certain organizations as "providential organizations," which are organizations that were founded by Reverend Moon as part of his wider ministry. It further asserts that heads of these providential organizations are appointed by, and subject to removal by, Family Federation. UCI is said to be one of these providential organizations.

In the third count, Family Federation makes the following assertion:

> As President and Chairman of the Board of Directors of UCI, Preston Moon is the head of a providential organization of the Unification Church and an agent of the Family Federation. In accepting this position, Preston Moon agreed to act on behalf of the Family Federation and Subject to the Family Federation's control and direction.

Family Federation also alleges that the other four directors wrongfully aided and abetted Preston Moon in his breaches of his duties as agent of Family Federation. Specifically in regards to count three, breach of principal-agent relationship, but in a sense in all claims, Family Federation asserts that it is the principal and UCI is the agent. Taking these assertions as true, Family Federation as principal clearly has standing to assert breaches of the fiduciary relationship created by Moon's

position as agent.  Nor is such a relationship inherently implausible, given the other allegations in the complaint.

### 3.  Breach of Contract and Quasi-Contract Claims

The Japanese Church's participation in this litigation is based primarily on its prominent role in funding the operations of UCI with hundreds of millions of dollars over a period of years.  The Japanese Church alleges a contractual breach: "A condition of the Japanese Church's contributions to UCI was the understanding that those funds would be used in a manner consistent with the purposes for which the [UCI] was established."

It is true that the general rule at common law was that "a donor who has made a completed charitable contribution . . . as an absolute gift . . . had no standing to bring an action to enforce the terms of his or her gift or trust . . . ." *Carl J. Herzog Found., Inc. v. University of Bridgeport*, 699 A.2d 995, 997 (Conn. 1997); *accord* Irish J. Goodwin, *Donor Standing to Enforce Charitable Gifts: Civil Society vs. Donor Empowerment*, 58 Vand. L. Rev. 1093, 1145 (2005).  But

the Japanese Church denies that the funding it provided was "an absolute gift."[20]

Each claim strongly characterizes the contributions as a restricted gift made to a

charitable corporation; funds that were contributed pursuant to a "condition" or

"promise" or "understanding."  Like any other transaction, there is no inherent

reason why funds could not be provided to a corporation, charitable or otherwise,

with a contractual understanding as to how the funds were to be used and thus

standing is established with respect to enforcing the restriction on the donations.


Turning to whether the Japanese Church has pleaded sufficient facts, we

agree with the trial judge that "[b]ased on the facts provided in the [c]omplaint, the

[c]ourt can reasonably infer that UCI had an obligation to use [the Japanese

Church's] funds for an express purpose, and it breached that obligation by

---

[20]   The Restatement recognizes that when a contribution or disposition is made to an "institution for a specific purpose . . . such as to support medical research . . . or to establish a scholarship fund in a certain field of study," Restatement (Third) of Trusts § 28, cmt. a (Am. Law Inst. 2003), then such a specifically targeted gift or contribution "creates a charitable trust of which the institution is the trustee . . . ." *Id.* The Restatement goes on to note that when a "nonprofit organization receives a restricted gift or devise that applicable law treats as a charitable trust . . . special-interest standing entitles the settlor to maintain a suit against the trustee-organization," although "only to enforce the restriction." Restatement (Third) of Trusts § 94, cmt. g (3) (Am. Law Inst. 2012).  While a restricted gift is not "a trust in the technical sense" and is "not bound by all the limitations and rules which apply to a technical trustee," the nonprofit organization "may not . . . receive a gift made for one purpose and use it for another . . . ." *St. Joseph's Hosp. v. Bennett*, 22 N.E.2d 305, 308 (N.Y. 1939).

allegedly diverting funds away from the specified purposes for which they were contributed," and thus pleaded sufficient facts for its contract claim. At the pleading stage, such a contractual or quasi-contractual relationship is not implausible and the Japanese Church has standing to assert the claims.

In summation, all plaintiffs have alleged their respective injuries, traceable to the defendants' actions, and the trial court can provide redress if the plaintiffs meet their respective burdens. *See Padou v. District of Columbia*, 77 A.3d 383, 389 (D.C. 2013). All parties have the requisite standing. Moreover, each claim has been pleaded with sufficient facts to withstand a Rule 12 (b)(6) challenge. The trial judge's denial of the defendants' motion taken on cross-appeal is therefore affirmed.

## III. Religious Abstention

We now turn to the direct appeal from the trial court's dismissal of plaintiffs' complaint. The trial court concluded that, under the doctrine of religious abstention mandated by the First Amendment, it lacked subject matter jurisdiction

pursuant to Super. Ct. Civ. R. 12 (h)(3).[21]   The application *vel non* of religious abstention has been treated as one of subject matter jurisdiction, *Heard v. Johnson*, 810 A.2d 871, 877 (D.C. 2002) (citation omitted), and the issue of subject matter jurisdiction is a question of law that this court reviews de novo, *Second Episcopal Dist. African Methodist Episcopal Church v. Prioleau*, 49 A.3d 812, 815 (D.C. 2012).

The trial court found that defendants had advanced a 'factual attack' on the complaint, "challeng[ing] the existence of subject matter jurisdiction irrespective of the pleadings." *Heard*, *supra*, 810 A.2d at 878.  However, at the time, discovery was in its infancy and in fact, as we read the record, the trial court in its ruling generally treated the allegations of plaintiffs as true and did not rely to any significant extent on other evidence on the issue.

---

[21]   That subsection provides:  "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the claim."  Defendants raised the issue by a motion for judgment on the pleadings, citing Super. Ct. Civ. R. 12 (c).  Challenges to subject-matter jurisdiction may also be raised by a motion under Super. Ct. Civ. R. 12 (b)(1). When a party challenges the trial court's subject matter jurisdiction over the case pursuant to Rule 12 (c), trial court should treat the motion for judgment on the pleadings as if it had been brought under Rule 12 (b)(1) (lack of subject matter jurisdiction).  *See Kirkham v. Societe Air France*, 429 F.3d 288, 291 (D.C. Cir. 2005); 5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367, at 221 (3d ed. 2004).

## A. The Religious Abstention Doctrine

As we recently reviewed at some length, "The First Amendment provides, in pertinent part, that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Samuel v. Lakew*, 116 A.3d 1252, 1256 (D.C. 2015) (quoting U.S. Const. amend. I.). Together, the Free Exercise and Establishment Clauses operate to "severely circumscribe the role that civil courts may play in the resolution of disputes involving religious organizations." *Id.* at 1256-57 (quoting *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 353 (D.C. 2005)). The First Amendment seeks to preserve the autonomy of religious entities "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 704 (2012) (citation omitted).

Nonetheless, the Free Exercise Clause "does not mean . . . that churches are above the law or that there can never be a civil court review of a church action," *Heard*, *supra*, 810 A.2d at 879. As we have recognized repeatedly, "[n]ot every civil court decision . . . jeopardizes values protected by the First Amendment." *Id.* (citation omitted); *see also Bible Way Church of Our Lord Jesus Christ of*

*Apostolic Faith of Wash., D.C. v. Beards*, 680 A.2d 419, 427 (D.C. 1996) (recognizing that "occasions can arise when civil courts are permitted to address church activity without running afoul of the First Amendment"). "Religious organizations come before [the courts] in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law . . . ." *Watson v. Jones*, 80 U.S. 679, 714 (1871). Especially when a dispute over property arises, "[t]here can be little doubt about the general authority of civil courts to resolve [the issue]," as "[t]he State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Jones v. Wolf*, 443 U.S. 595, 602 (1979). Generally, "[c]ivil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property." *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969).

In sum, the mere fact that the issue before the court involves a church or religious entity does not thereby bar access to our courts. On the contrary, the courts as the ultimate arbiter of disputes short of anarchy and self-help have a

constitutional duty to carry out their basic function to the maximum permissible extent.

In determining the line where the First Amendment bars judicial resolution of disputes, this jurisdiction has consistently relied on the application of "neutral principles of law" to the parties' contentions. "The touchstone for determining whether civil courts have jurisdiction is whether the courts may employ 'neutral principles of law' and ensure that their decisions are not premised on the 'consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'" *Prioleau*, *supra*, 49 A.3d at 816 (citing *Meshel*, *supra*, 869 A.2d at 354 (citation omitted)).

## B. Premature Decision on Application of Doctrine

As already described, plaintiffs' complaint in this case is based upon four distinct causes of action based upon four familiar fields of law. In its allegation of the establishment of a trust and its breach, plaintiffs invoke an ancient and well-developed legal area with deep roots in Anglo-American law. On the count of corporate duties and irregularities, the plaintiffs implicate another much-litigated area. In its count on breach of contract and quasi-contract, plaintiffs raise issues

encountered by first-year law students. Finally, in its count on principal and agent, plaintiffs rely upon doctrines basic to our legal system. Thus, on its face, it would appear that this dispute is susceptible to resolution by "neutral principles of law" not requiring any forbidden inquiry into matters barred by the First Amendment. In our view, in the present posture of this particular case, a contrary conclusion should be based on a fuller exposition of the facts underlying each cause of action and not be decided on the pleadings prior to discovery and further evidentiary presentation by plaintiffs.

To be sure, a court must "look not at the label placed on the action but at the actual issues the court has been asked to decide." *Samuel*, *supra*, 116 A.3d at 1259 (citations omitted). And we are not unmindful of the principle that in a First Amendment case, a plaintiff must present facts that take the case outside the constitutional constraint and bears the ultimate burden to establish jurisdiction.[22] As indicated in this opinion, however, we are satisfied that the plaintiffs' pleadings are sufficient to survive dismissal on these grounds at this point in the precise circumstances here. This is not a suit directly against a church, synagogue, or

---

[22] In this regard, we note, as we did in *Samuels*, that "The Supreme Court in *Hosanna-Tabor* [*Evangelical Lutheran Church & Sch. V. EEOC*] held that a defense rooted in the religious clause of the First Amendment was an affirmative defense, rather than a jurisdictional bar." 116 A.3d at 1261 n.16 (citing *Hosanna-Tabor*, 132 S. Ct. at 710 n.4). No party has raised this issue before us.

mosque or their immediate leadership. On the contrary, the defendant entity at issue here is a taxable, albeit nonprofit, corporation. Nor does it appear that the individual defendants have a direct religious role within the church as such, but rather are basically operating in a secular capacity. Any claim for early immunity from suit is far less compelling than may be the case in more typical disputes evoking First Amendment considerations. And, as we show, the actual issues determinative of the outcome of this case may well be resolvable without infringement into areas precluded from court consideration by the First Amendment.

## 1. Elements of Proof

In its order of dismissal, the trial court appeared to be particularly concerned with one aspect of this case. In its view, based on "[t]he available corporate documents in this case," the trial court could not adjudicate any of the claims under neutral principles of law. We agree with plaintiffs' argument that this pure documentary approach to deciding the abstention issue may have erroneously permeated the entire analysis.

The trial court read several decisions of this court[23] to stand for the proposition that when a civil court is able to resolve a dispute implicating questions of church doctrine or polity, "it was able to do so because the corporate documents clearly established that [the legal theories at issue] were firmly established as distinct and separate from matters of church doctrine or polity."  Based on that reading, the trial court concluded that "[t]he available corporate documents in this case . . . are insufficient to permit the court to exercise neutral principles of law which could provide a sole basis for the resolution of this dispute."  It repeated this conclusion when it specifically found that the claims of breach of trust and breach of fiduciary duty could not be adjudicated because "there are no neutral principles of law apparent from the documents which have been presented to the Court" that would enable it to do so without "implicating the Unification movement's polity."

We do not take issue with the trial court's attachment of importance to UCI's governing documents.  But it does not follow that the application of neutral principles of law must depend on documentary evidence alone.  This court has interpreted *Jones v. Wolf*, *supra*, and *Maryland & Virginia Eldership of the*

---

[23] *E.g.*, *Prioleau*, *supra*, 49 A.3d at 817; *United Methodist Church, Balt. Annual Conference v. White*, 571 A.2d 790, 793 (D.C. 1990); *Save Immaculata/Dunblane, Inc.*, *supra*, 514 A.2d at 1153-57.

*Churches of God*[24] to permit civil courts to "look to familiar corporate and trust principles of law for relief," so long as courts do "not decide[] questions of church doctrine, polity, or administration." *Save Immaculata/Dunblane*, *Inc*., *supra*, 514 A.2d at 1156-57. *Jones* itself permitted civil courts to adjudicate a property dispute under neutral principles of law, provided that the intent of the parties was "in some legally cognizable form." 443 U.S. at 606. Legal rules underlying proof in trust, corporate, contract, and agency disputes are replete with circumstances under which non-documentary evidence may be relevant and permitted. *See Bishop & Diocese of Colo. v. Mote*, 716 P.2d 85, 100 (Colo. 1986) (discussing *Jones*, *supra*, 443 U.S. at 610-21) (noting that the Constitution does not mandate such a "narrow inquiry"). Neutral principles of law analysis may include "other principles from the common and statutory law of property, contracts, corporations or voluntary associations . . . ." *Id.* at 100-01; *accord Hope Presbyterian Church of Rogue River v. Presbyterian Church (U.S.A.)*, 291 P.3d 711, 722-23 (Or. 2012) (noting that under the neutral principles approach, a civil court would be permitted to determine whether a trust existed under the Uniform Trust Code, which does not require documentary evidence to create a trust). Such an approach permits the parties to marshal as much evidence in support of their claim as possible, and

---

[24] *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg*, *Inc*., 396 U.S. 367 (1970).

permits the trial court to make a reasoned, thoughtful determination on the issue of subject matter jurisdiction based on a more robust record, and helps to ensure that the doors to the civil courthouse are not closed prematurely.

## 2. The Individual Counts

On the breach of trust and corporate misconduct counts, the trial court was understandably concerned about its ability to locate the alleged authority of Reverend Moon to name the directors and how such exercise of authority was consistent with director fiduciary duty to UCI. Such concern, however, seems to postulate the binding authority of the corporate documents. Proof of the existence and terms of the alleged trust and of the circumstances surrounding the creation and operations of the corporation could impose an overriding fiduciary duty not necessarily inconsistent with the corporate documents.

In certain circumstances, a long-standing pattern or practice of corporate behavior may give rise to a by-law. *See, e.g.*, *National Confederation of Am. Ethnic Grps. v. Genys*, 457 A.2d 395, 399 (D.C. 1983) (noting that the "long and continuous usage of proxy voting has the force and effect of a by[-]law" (internal quotations omitted)) and citing, *inter alia*, *Walker v. Johnson*, 17 App. D.C. 144

(D.C. Cir. 1900); *see also Lewis v. Don King Prods., Inc.*, 94 F. Supp. 2d 430, 444 (S.D.N.Y. 2000); *Lamm v. Board of Comm'rs for Vermilion Hosp. Serv. Dist. No 1*, 378 So. 2d 919, 922 (La. 1979); *Dousman v. Kobus*, No. 19258-NC, 2002 WL 1335621, at \*13, 15 (Del. Ch. June 6, 2002) (quoting and citing *In re Osteopathic Hosp. Ass'n of Del.*, 195 A.2d 759, 762 (Del. 1963)). The trial court dismissed plaintiffs' argument, concluding that such an implied by-law relating to appointment of directors could not exist, because it would breach the directors' fiduciary duty to act in the best interest of the corporation.

We believe that the trial court's conclusion was premature. It is of course a "basic principle" of corporate law "that directors are subject to the fundamental fiduciary duties of loyalty and disinterestedness." *Andarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988). But the ultimate question here may be, under all the circumstances, where exactly that fiduciary duty lay. For example "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Id.* Here, plaintiffs have alleged in effect that although UCI was established as a nonprofit corporation, it was and is in fact a subsidiary entity, both to Reverend Moon's oral trust in 1977, and to Family Federation. The original Articles acknowledge Reverend Moon to be the leader of

the Unification Church movement. For three decades, plaintiffs assert, Reverend Moon and his church entities guided the corporation in its activities and named every member to the Board of Directors. Moreover, and importantly, as already noted, these practices were not necessarily inconsistent with the corporate documents and might be viewed as supplemental thereto. It is in this context, if fully fleshed out and proven, that the precise fiduciary duties can be adjudged.

Moreover, plaintiffs here in a separate count have alleged that a concrete principal-agent relationship existed between Family Federation and Preston Moon with respect to the operation of UCI. The trial court was concerned about this count as obligating it to impermissibly inquire into the governing hierarchy of the Church. But we fail to see why this necessarily must prove to be the case. The relationship between Preston Moon and Family Federation does not necessarily turn on facts involving religious doctrine and practices or the internal policies of the Unification Church. Plaintiffs assert that the "right to control and direct" Preston Moon can be established "through documents[,] [] testimony," and the actual course of dealings between the parties, and not through application of "the Divine Principle or through any interpretation of Unification Church doctrine." Neutral principles of law can govern the establishment of an agency relationship, and it may be that an examination of the structure and long-standing practices of

the Church will provide an answer to the actual existence of such a relationship. *See Heard*, *supra*, 810 A.2d at 880 (applying neutral principles of law to employment disputes); *EEOC v. Miss. Coll.*, 626 F.2d 477 (5th Cir. 1980). At this stage, we believe that it is premature to preclude plaintiffs from proffering evidence in support of their claim that would permit an adjudication of this claim without impermissible intrusion into "religious doctrine and practice."

Apart from the appointment of directors, the trial court expressed concern about its ability to determine whether, in their actions reorganizing the corporation and changing its expenditure recipients, the defendants had deviated from the original purpose of the corporation or had acted ultra vires. In particular, it failed to see how it could determine whether those actions were or were not in accord with the "Divine Principle" expressed in the Articles of Incorporation.

This is also an understandable concern but one, we think, that does not absolutely preclude consideration of plaintiffs' claims at this point. Determining who the intended beneficiaries of a trust were and whether corporate assets were used in accordance with corporate laws are normally governed by neutral principles of law. *See Hooker*, *supra*, 579 A.2d at 612. While it may be difficult at times to draw clear lines, a deviation by a charitable corporation from its original

purpose may be so great as to preclude any argument that correction was not called for.

It can be a breach of duty to "change substantially the objects and purposes of the corporation." 7A Fletcher Cyclopedia of the Law of Corps. § 3718 (2006); *see Queen of Angels Hosp. v. Younger*, 136 Cal. Rptr. 36, 41 (Cal. Ct. App. 1977) ("The question is whether [the corporation] can cease to perform the primary purposes for which it was organized. That, we believe, it cannot do."); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005) (distinguishing legal powers of directors from equitable duty); *Matter of Manhattan Eye, Ear & Throat Hosp. v. Spitzer*, 715 N.Y.S. 2d 575, 595 (N.Y. Sup. Ct. 1999) (breach of fiduciary duty to depart "from the charity's central and well-understood mission").

From plaintiffs' allegations, it appears that a profound alteration in the corporation, perhaps recognized by the directors themselves in changing the name and amending the article of incorporation, occurred under Preston Moon. An organization plainly established to promote the preservation of African wildlife and acquiring vast funds on that basis might well be barred from switching its purpose to expenditures on domestic cats and dogs regardless of how technically

such a switch might be read into the text of its articles of incorporation. On the present record, we cannot say with confidence that a somewhat analogous transformation cannot be shown to have occurred here. And, in any event, the allegation that corporate funds were used here to benefit one of the directors personally would appear readily subject to court review. [25]

To be sure, the trial court should not be called on to make a lengthy and painstaking interpretation of UCI's "Divine Principle," as "the court must be cautious not to entangle itself in the decision-making process of the Church with regard to its religious obligations." *Costello Publ'g Co. v. Rotelle*, 670 F.2d 1035, 1050 n.31 (D.C. Cir. 1981). However, these concerns "should not block the court, from at least considering," *id.*, "the circumstances of the alleged activity to determine whether a religious concern existed and whether a nonintrusive remedy could be fashioned." *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1360 (D.C. Cir. 1990) (discussing *Costello Publ'g Co.*, *supra*, 670 F.2d at 1050 n.31). At least some factual inquiry by the trial court into

---

[25] The same considerations apply to the Japanese Church's claims of contract and quasi-contractual breaches, which are based upon the same assertion of misuse of funds donated by it, and it may be that the contract terms limited the permissible use of corporate funds more sharply than the articles themselves. "A church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court." *Minker*, *supra*, 894 F.2d at 1359 (citing *Watson*, *supra*, 80 U.S. at 714).

the nature of UCI's use of assets by the trial court would not appear to violate the First Amendment.

In sum, we agree with plaintiffs that the record at this early stage of a difficult and complicated dispute with many ramifications does not support a conclusion that the trial court must engage in inquiry banned by the First Amendment in order to resolve any of plaintiffs' claims. *See Prioleau*, *supra*, 49 A.3d at 817 (concluding that at the motion to dismiss stage, "the record as developed" did not suggest that resolving plaintiff's contract claim would "require the court to entangle itself in church doctrine"). Were we to hold that, based on the current record, the First Amendment precludes our civil courts from adjudicating plaintiffs' claims, then it would approach granting immunity to "every nonprofit corporation with a religious purpose from breach of fiduciary suits . . . and prevent any scrutiny of questionable transactions." *Askew v. Trustees of the Gen. Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc.*, 644 F. Supp. 2d 584, 597 (E.D. Pa. 2009).[26]

---

[26] We take special note, however, as we did in *Prioleau*, that "going forward, if it becomes apparent to the trial court that this dispute does in fact turn on matters of doctrinal interpretation or church governance, the trial court may grant summary judgment to avoid excessive entanglement with religion." 49 A.2d at 818 (internal quotation and citation omitted).

## IV. Conclusion

Accordingly, we affirm the order of the trial court denying defendants' motion to dismiss, we reverse the order of the trial court granting defendants' motion for judgment on the pleadings, and we remand the case for further proceedings consistent with this opinion.

*So ordered.*